107 T.C. No. 7


UNITED STATES TAX COURT


REPUBLIC PLAZA PROPERTIES PARTNERSHIP, PFI REPUBLIC
LIMITED, INC., TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 23300-94.              Filed September 16, 1996.


Company A (A) sold Company B (B) a 35-percent
interest, and retained a 65-percent interest, in a
commercial office building (building) that was subject
to an existing loan (loan) made by Company C (Lender).
A and B contributed their respective interests in the
building to Partnership P (P) that was formed by A and
B pursuant to a partnership agreement (partnership
agreement), and P assumed the loan. Pursuant to a
lease, P leased A the building, which was approximately
29 percent vacant, for a term of 24 years and 11.5
months. Except for a small amount of space, A was not
to occupy the building, but instead was to sublease it.
The lease required A to pay P rent in the amounts and
on the dates specified in a schedule contained in the
lease (rent payment schedule) that took into account,
inter alia, the requirements of Lender with respect to
servicing the loan. The lease and the rent payment
schedule allocated the rental payments for the entire

lease term, providing that the amount of rent to be paid by A for the first 11.5 months of the lease term was zero (11.5-month period of zero rent) and specifying the amounts and due dates of the rent to be paid by A over the 24 years of the lease term following that 11.5-month period. The agreement under which A sold B a 35-percent interest in the building required, inter alia, that P deliver to Lender a letter of credit naming Lender as beneficiary (Lender letter of credit) in order to secure P's obligations under the loan and that A deliver to P a letter of credit naming P as beneficiary (P letter of credit) in order to secure P's obligations under the Lender letter of credit. In order to service the loan during the 11.5-month period of zero rent, A and B agreed in the partnership agreement to make additional capital contributions to P on the first day of each month during the last 11 months of that period.

Respondent concedes that if the Court were to find that the 11.5-month period of zero rent qualifies as a reasonable rent holiday described in sec. 467(b)(5)(C), I.R.C.,[1] P would be entitled for 1988 to accrue rent under the lease pursuant to the terms of the lease (respondent's concession).

Held: The 11.5-month period of zero rent qualifies as a reasonable rent holiday described in sec. 467(b)(5)(C). Accordingly, pursuant to respondent's concession, P shall accrue rent for 1988 in accordance with the lease as provided in sec. 467(b)(1)(A).

Held, further: The lease did not allocate rent to the 11.5-month period of zero rent in an amount equal to the P letter of credit, and P is not required for 1988 to accrue as rent the amount of that letter of credit.

Clark Reed Nichols and Cheryl A. Chevis, for petitioner.

Gerald W. Douglas, for respondent.

---

[1] All section references are to the Internal Revenue Code (Code) in effect for 1988. All Rule references are to the Tax Court Rules of Practice and Procedure.

CHIECHI, Judge: In the notice of final partnership administrative adjustment (FPAA), respondent determined adjustments to the Form 1065 (Federal partnership return) that Republic Plaza Properties Partnership (Partnership) filed for 1988.

The issues remaining for decision are:

(1) Is the 11.5-month period of zero rent at the beginning of the lease (lease agreement) of an office building by Partnership to BCE Development Properties, Inc. (BCE) a reasonable rent holiday described in section 467(b)(5)(C)? We hold that it is.

(2) Did the lease agreement provide that the amount of a letter of credit (viz, $8,872,245), which at the request of BCE was issued in favor of Partnership, is rent that is allocated to the first 11.5 months of that agreement so that Partnership is required for 1988 to accrue as rent the amount of that letter of credit? We hold that the lease agreement does not so provide and that Partnership is not required to accrue that amount as rent for 1988.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

PFI Republic Limited, Inc. (PFI) is the tax matters partner for Partnership. At the time the petition was filed, Partnership's principal place of business was in Portland, Oregon.

In 1987, Commercial Union Capital Corporation (Commercial Union), an investment banker employed by BCE, approached PFI

concerning PFI's interest in investing in a sale-leaseback transaction involving a 56-story office building located in the central business district of Denver, Colorado, that was known and is herein referred to as Republic Plaza. During all relevant periods, PFI and BCE were unrelated companies that, prior to 1987, had no business dealings with each other. The investment that Commercial Union initially proposed to PFI involved a lease of Republic Plaza to BCE for a period of 26 to 28 years, which was to include a rent holiday[2] of approximately 1 year that was to occur at the beginning of the lease term.

During the course of its investigation of the investment proposed by Commercial Union, PFI employed Marshall and Stevens Incorporated (Marshall and Stevens) to prepare an appraisal report (Marshall and Stevens appraisal report). Merle E. Atkins (Mr. Atkins) and John H. Whitcomb (Mr. Whitcomb), who are qualified as experts in the area of real estate appraisal, prepared that report. PFI relied on the Marshall and Stevens appraisal report in evaluating its proposed investment in Republic Plaza, including, inter alia, the reasonableness of the rent holiday included as part of that investment.

On June 14, 1988, Partnership was formed pursuant to a partnership agreement entered into between BCE and PFI (partner-

---

[2] As used herein, the term "rent holiday" means a period of zero or reduced rent occurring at the beginning of a lease.

ship agreement).  During all relevant periods, Partnership, a general partnership governed by the laws of Colorado, maintained its books and records and filed its Forms 1065 on a calendar year basis using the accrual method of accounting.

In connection with the formation of Partnership, a series of interrelated events occurred.  Contemporaneous with the formation of Partnership, on June 14, 1988, pursuant to a written purchase agreement (purchase agreement), PFI purchased an undivided 35-percent interest in Republic Plaza from BCE, whereupon BCE owned a 65-percent undivided interest therein.

Immediately thereafter, also on June 14, 1988, PFI and BCE contributed their respective interests in Republic Plaza to Partnership.  Partnership took ownership of Republic Plaza subject to a promissory note, dated April 30, 1986, that obligated BCE to pay $200 million to Teachers Insurance and Annuity Association (TIAA).  Pursuant to an agreement between TIAA and Partnership that was entered into as of June 14, 1988, that note was restructured.  Effective June 17, 1988, as restructured, Partnership became the obligor under the promissory note issued to TIAA (TIAA term loan), the outstanding principal balance of that note was reduced to $177,766,184, the maturity date of that note was changed to May 1, 2011, and that note required monthly payments of varying amounts of principal and interest over the term of the loan until it matured on May 1, 2011.

Pursuant to the lease agreement dated June 14, 1988, Partnership leased Republic Plaza to BCE for a fixed term that commenced on June 17, 1988, and ends at midnight on June 1, 2013 (lease term), unless extended at the option of BCE, the lessee. At the time Partnership and BCE entered into the lease agreement, tenants occupied approximately 71 percent of Republic Plaza pursuant to existing leases, and approximately 29 percent of that office building was vacant. Pursuant to the lease agreement, BCE became the sublessor with respect to those existing tenants and was given the right to receive rent from them.

In order to satisfy the requirements of TIAA, the mortgagor of Republic Plaza, the lease agreement required monthly payments of rent that were to (1) start on July 1, 1989, and terminate on May 1, 2011, (2) be at least equal to the amounts required to pay the monthly debt service on the TIAA term loan, and (3) be used first to satisfy Partnership's obligations under that loan. Starting on June 1, 2011, after the TIAA term loan was to have been paid in full, the lease agreement required an annual payment of rent for each of the last 2 years of the lease term. In order to service the TIAA term loan during the initial lease period of approximately 11.5 months that began on June 17, 1988, and ended on May 31, 1989, during which the rent to be paid according to the lease agreement was zero (11.5-month period of zero rent), BCE and PFI agreed in the partnership agreement to make total

additional capital contributions to Partnership on the first day of each month during the period July 1, 1988, through June 1, 1989, in the amount of approximately $1,759,144.

The amounts and due dates of rent payable under the lease agreement that were not required by TIAA in order to service the TIAA term loan were developed through the use of a computer program that took into consideration certain requirements of the lessor and the lessee. Those requirements included (1) creating a schedule for the payment of rent that took account of projected increases in rent in the Denver market for office space (Denver office market) and that not only provided a certain yield for the lessor and its partners[3] but also minimized the cost to the lessee and (2) structuring the total amount of rent to be paid during each of the 24-annual lease periods that start on June 1 and end on May 31 (annual lease period) following the 11.5-month period of zero rent (including the amount of rent to be paid monthly to service the TIAA term loan) so that such total amount during each such period was always within 90 percent to 110 percent of the average annual amount of the aggregate rent that

---

[3] PFI entered into the sale-leaseback transaction involving Republic Plaza in order to make a profit. At the time PFI was determining the profit that it expected to realize from that transaction, it anticipated that it would (1) pay Federal and State income taxes at the highest marginal rate throughout the lease term, (2) realize $205 million of pretax profit, and (3) pay in the aggregate approximately $75 million in income taxes over the lease term.

was to be paid over those 24 years of the lease term.

Taking into account the foregoing considerations involving the requirements of the TIAA term loan, Partnership, PFI, and BCE, the lease agreement contained the following provisions with respect to the amounts and due dates of the rent to be paid under that agreement. It required BCE to pay Partnership "net basic rent" (basic rent) in arrears on each installment date throughout the lease term "in an amount equal to the sum of the Basic Rent Portions for all Partners."[4] Schedule E of the lease agreement set forth a schedule (rent payment schedule) that allocated the basic rent to be paid by BCE for the entire lease term, providing the amounts of basic rent to be paid and the due dates for the payment of such rent. Pursuant to the lease agreement and the rent payment schedule, (1) for the initial lease period of approximately 11.5 months that began on June 17, 1988, and ended on May 31, 1989, the amount of basic rent to be paid by BCE was zero; and (2) for each of the 24-annual lease periods thereafter

---

[4] The lease agreement provided that "For any Installment Date, the 'Basic Rent Portion' for any Partner shall mean the product of (i) said Partner's percentage interest in the Lessor as speci- fied on Schedule E, times (ii) the percent figure for such Part- ner set forth opposite said Installment Date, times (iii) Les- sor's Cost as specified on Schedule E." The lease agreement defined the term "installment date" for purposes of the payment of the basic rent to mean July 1, 1989, and the first day of each month thereafter throughout the lease term. For all other purposes, the lease agreement defined that term to mean July 1, 1988, and the first day of each month thereafter during the lease term.

that start on June 1 and end on May 31, the total amount of basic

rent to be paid by BCE was as follows:[5]

| Annual Lease Period | Total Amount of Basic Rental Payments |
|---|---|
| June 1, 1989, through May 31, 1990 | $27,185,083.85 |
| June 1, 1990, through May 31, 1991 | 27,185,083.85 |
| June 1, 1991, through May 31, 1992 | 27,185,083.85 |
| June 1, 1992, through May 31, 1993 | 27,185,083.85 |
| June 1, 1993, through May 31, 1994 | 27,185,083.85 |
| June 1, 1994, through May 31, 1995 | 27,185,083.85 |
| June 1, 1995, through May 31, 1996 | 27,185,083.85 |
| June 1, 1996, through May 31, 1997 | 27,185,083.85 |
| June 1, 1997, through May 31, 1998 | 27,185,083.85 |
| June 1, 1998, through May 31, 1999 | 27,185,083.85 |
| June 1, 1999, through May 31, 2000 | 27,185,083.85 |
| June 1, 2000, through May 31, 2001 | 33,226,213.70 |
| June 1, 2001, through May 31, 2002 | 33,226,213.70 |
| June 1, 2002, through May 31, 2003 | 33,226,213.70 |
| June 1, 2003, through May 31, 2004 | 33,226,213.70 |
| June 1, 2004, through May 31, 2005 | 33,226,213.70 |
| June 1, 2005, through May 31, 2006 | 33,226,213.70 |
| June 1, 2006, through May 31, 2007 | 33,226,213.70 |
| June 1, 2007, through May 31, 2008 | 33,226,213.70 |
| June 1, 2008, through May 31, 2009 | 33,226,213.70 |
| June 1, 2009, through May 31, 2010 | 33,226,213.70 |
| June 1, 2010, through May 31, 2011 | 33,226,213.70 |
| June 1, 2011, through May 31, 2012 | 33,226,213.70 |
| June 1, 2012, through May 31, 2013 | 27,185,083.85 |

For each of the 22-annual lease periods immediately follow-

ing the 11.5-month period of zero rent, the rent payment schedule

---

[5] One of petitioner's exhibits that purported to show that the rent payment schedule complied with the standards established by Rev. Proc. 75-21, 1975-1 C.B. 715, indicated that the total amount of basic rent to be paid for each of the 24-annual lease periods following the 11.5-month period of zero rent was slightly greater than the total amount of basic rent to be paid for each such period that we have calculated in accordance with Schedule E. Although it is unclear from the record why these minimal discrepancies exist, they do not affect our findings or conclusions herein.

required monthly payments on the first day of each month of the
amount of basic rent specified in that schedule. For each of
those periods, the rent payment schedule required a monthly
payment on February 1 of the basic rent specified in that sched-
ule that was significantly larger than the monthly payments
required on the first day of the other 11 months of each such
period.[6] For each of the last two annual lease periods of the
lease term, the rent payment schedule required an annual payment

---

[6] For most of the 22-annual lease periods immediately following
the 11.5-month period of zero rent, the rent payment schedule
required equal monthly payments of the basic rent specified in
that schedule for all months throughout each such period except
February. To illustrate, for the annual lease period that began
on June 1, 1989, and ended on May 31, 1990, the lessee was
required to remit the basic rent for that period, payable in
arrears, by paying (1) $1,761,894.98 on July 1, 1989, and on the
first day of each month thereafter except February and
(2) $7,804,239.91 on Feb. 1, 1990. However, for each of certain
of those 22-annual lease periods (viz, those annual lease periods
during which the monthly payments due under the TIAA term loan
were to change pursuant to the terms of that loan), the rent
payment schedule required for each such lease period (1) equal
monthly payments of the basic rent specified therein on July 1
and on the first day of each month thereafter through January,
(2) a monthly payment of basic rent in a significantly larger
amount on February 1, and (3) equal monthly payments of the basic
rent specified therein on March 1 and on the first day of each
month thereafter through June. The monthly payments due under
the TIAA term loan were to change as of Feb. 1, 1993, Feb. 1,
1998, and Mar. 1, 2003, and, consequently, the monthly payments
of the basic rent specified in the rent payment schedule were to
change as of those dates. To illustrate, for the annual lease
period that began on June 1, 1992, and ended on May 31, 1993, the
lessee was required to remit the basic rent for that period,
payable in arrears, by paying (1) $1,761,894.98 on July 1, 1992,
and on the first day of each month thereafter through Jan. 1,
1993, (2) $7,689,721.21 on Feb. 1, 1993, and (3) $1,790,524.66 on
Mar. 1, 1993, and on the first day of each month thereafter
through June 1, 1993.

on February 1 of the basic rent specified in that schedule for each such period.

Pursuant to the rent payment schedule in the lease agreement, the total amount of basic rental payments specified in that schedule (1) remained constant at $27,185,083.85 for each of the 11-annual lease periods immediately following the 11.5-month period of zero rent, (2) increased to $33,226,213.70 for each of the succeeding 12-annual lease periods, and (3) returned to $27,185,083.85 for the final annual lease period. The total rent to be paid during each of the 24-annual lease periods following the 11.5-month period of zero rent was not greater than 10 percent above or 10 percent below the average annual amount of the aggregate basic rent that was to be paid over those 24 years of the lease term.

On June 17, 1988, BCE, as lessee under the lease agreement, began immediate economic use of Republic Plaza. Except for a relatively small amount of space used by BCE for its operations as sublessor of Republic Plaza, at no time during any relevant period did BCE occupy the space it leased in that building under the lease agreement. BCE, as lessee, was required to pay the basic rent in the amounts and on the dates specified in the lease agreement and the rent payment schedule. BCE, and not Partnership, assumed the risk of subleasing the approximately 29 percent of Republic Plaza that was vacant at the time Partnership and BCE

entered in that agreement as well as any space that became vacant when existing leases expired or tenants defaulted under their leases.

The Marshall and Stevens appraisal report on which PFI relied in evaluating, inter alia, the reasonableness of the 11.5-month period of zero rent provided by the lease agreement contained discussions of various matters, including the condition of the Denver office market at the time the lease agreement was executed, the practice in that market of granting rent holidays and other lease concessions in order to attract lessees, and specific situations in that market in which the lessors of commercial office buildings had granted periods of free rent and other lease concessions to lessees. At the time Partnership and BCE entered into the lease agreement, Partnership and its partners PFI and BCE were aware of, inter alia, those matters.

At the time the lease agreement was executed in June 1988, the Denver office market was suffering the aftereffects of overbuilding that occurred during the late 1970's and early 1980's. Consequently, at that time, the Denver office market was experiencing high vacancy rates of approximately 27 percent, and, in order to attract lessees, lessors were offering prospective lessees various types of concessions and low rental rates. Prior to the execution of the lease agreement in June 1988, the lessor under the existing leases for space in Republic Plaza had typi-

cally granted periods of free rent as concessions to lessees. At the time the lease agreement was executed, the inclusion of such rent holidays in commercial leases like the lease agreement involved here was one type of concession offered by lessors that was a reasonable and acceptable practice in the Denver office market (and throughout the commercial real estate industry), irrespective of whether the lessees under such leases intended to occupy the leased space or to sublease it to others. Although Marshall and Stevens expected the practice of including rent holidays in commercial leases to continue for a few years after June 1988, it anticipated that the Denver office market would tighten during those years, with the result that rental rates would increase, vacancy rates would decrease, and fewer lease concessions would be granted to lessees by lessors.

At the time Partnership and BCE entered into the lease agreement, it was a reasonable and acceptable practice throughout the commercial real estate industry, including the Denver office market, to offer rent holidays in long-term commercial leases such as the lease agreement involved here in order to induce the lessee/sublessor to agree to assume the risk of subleasing the unleased, vacant space to others.[7] Specifically, in June 1988, when the lease agreement was executed, it was consistent with

_____

[7] The typical periods of free rent being offered in the Denver office market at the time the lease agreement was executed were 6 months on 5-year leases and 12 months on 10-year leases.

reasonable and acceptable practice throughout the commercial real estate industry, including the Denver office market, for the lease agreement to grant an 11.5-month period of zero rent, since under that agreement BCE was to sublease, rather than occupy, virtually all of Republic Plaza for about 25 years, and it thereby assumed the risk of subleasing the approximately 29 percent of unleased, unoccupied space in that building.[8]

In order to secure payment on the TIAA term loan, the purchase agreement contained certain provisions required by TIAA. Specifically, as of the time of its closing on June 17, 1988, the purchase agreement obligated (1) Partnership, the obligor under the TIAA term loan and the lessor under the lease agreement, to deliver to TIAA an irrevocable standby letter of credit initially in the amount of $8,872,245 (TIAA letter of credit) that was to be issued by the Canadian Imperial Bank of Commerce (CIBC) and that was to name TIAA as beneficiary in order to secure Partnership's obligations under that loan; (2) BCE, the seller of an undivided 35-percent interest in Republic Plaza and the lessee under the lease agreement, to deliver to Partnership an irrevoca-

---

[8]  BCE's risk under the lease agreement included its incurring expenses in order to attract tenants, such as providing improvements to the unleased, vacant space in Republic Plaza and granting rent holidays at the inception of subleases.  The 11.5-month period of zero rent granted to BCE by the lease agreement enhanced the ability of BCE, as sublessor, to grant rent holidays that were consistent with commercial practice in the Denver office market to prospective lessees of space in Republic Plaza.

ble standby letter of credit initially in the amount of $8,872,245 (Partnership letter of credit) that was to be issued by CIBC and that was to name Partnership as beneficiary in order to secure Partnership's obligations under the TIAA letter of credit; and (3) Partnership, the obligor under the TIAA term loan and the lessor under the lease agreement, to assign collaterally the Partnership letter of credit to CIBC.  During the 11.5-month period of zero rent, the TIAA letter of credit and the Partnership letter of credit were intended to secure the obligation of BCE and/or of PFI, the partners of Partnership, to make additional capital contributions to Partnership during that period as required by the partnership agreement in order to service the TIAA term loan.

As required by the purchase agreement, as of the time of its closing, (1) Partnership delivered to TIAA the TIAA letter of credit that was issued by CIBC, effective June 15, 1988, in an amount not exceeding $8,872,245 and that named TIAA as beneficiary;[9] (2) BCE delivered to Partnership the Partnership letter of credit that was issued by CIBC, effective June 15, 1988, in the amount of $8,872,245 and that named Partnership as benefi-

---

[9] The TIAA letter of credit that Partnership delivered to TIAA expired on Mar. 1, 1989, and was deemed automatically extended without amendment for 1 year from that or any future expiration date until no later than June 30, 1991 (unless CIBC notified TIAA and Partnership at least 40 days prior to any such expiration date that it decided not to extend the TIAA letter of credit).

ciary;[10] and (3) Partnership collaterally assigned the Partnership letter of credit to CIBC.

The lease agreement recited that BCE, as lessee of Republic Plaza, "has delivered" the Partnership letter of credit with an expiry date of June 30, 1989, in order to secure BCE's obligations under that agreement, including its obligation to remit the basic rent in the amounts and on the dates specified in the rent payment schedule.[11]  The lease agreement further recited that Partnership could assign the Partnership letter of credit to CIBC as collateral and that, as of June 14, 1988, Partnership had collaterally assigned its rights in that letter of credit to CIBC.  Partnership directed BCE in the lease agreement to deliver the Partnership letter of credit and any extension or replacement thereof directly to CIBC to be held as collateral on behalf of Partnership.

---

[10]  The Partnership letter of credit that BCE delivered to Partnership expired on Mar. 1, 1989, and was deemed automatically extended without amendment for 1 year from that or any future expiration date until no later than June 30, 1991 (unless CIBC notified Partnership and BCE at least 50 days prior to any such expiration date that it decided not to extend the Partnership letter of credit).

[11]  Pursuant to the lease agreement, at least 40 days prior to Dec. 31, 1988, Dec. 31, 1989, and Dec. 31, 1990, respectively, BCE was required to deliver to Partnership an extension or replacement of the Partnership letter of credit, or of any such extension or replacement, in an amount prescribed in the lease agreement.  Each such extension or replacement was to have an expiry date that occurred no earlier than 30 days and no later than 60 days after Dec. 31, 1988, Dec. 31, 1989, Dec. 31, 1990, and Apr. 30, 1991, respectively.

In the Federal partnership return that Partnership filed for 1988, it did not accrue any rent under the lease agreement.

OPINION

Petitioner bears the burden of proving that respondent's determinations in the FPAA are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

On brief, the parties agree that the lease agreement is a section 467 rental agreement, as defined in section 467(d), and that therefore Partnership is subject to section 467.  Section 467 provides in pertinent part:

(b) ACCRUAL OF RENTAL PAYMENTS.--

　　(1) ALLOCATION FOLLOWS AGREEMENT.--Except as provided in paragraph (2), the determination of the amount of rent under any section 467 rental agreement which accrues during any taxable year shall be made--

　　　　(A) by allocating rents in accordance with the agreement, and

　　　　(B) by taking into account any rent to be paid after the close of the period in an amount determined under regulations which shall be based on present value concepts.

　　(2) CONSTANT RENTAL ACCRUAL IN CASE OF CERTAIN TAX AVOIDANCE TRANSACTIONS, ETC.--In the case of any section 467 rental agreement to which this paragraph applies, the portion of the rent which accrues during any taxable year shall be that portion of the constant rental amount with respect to such agreement which is allocable to such taxable year.

　　(3) AGREEMENTS TO WHICH PARAGRAPH (2) APPLIES.-- Paragraph (2) applies to any rental payment agreement if--

　　　　(A) such agreement is a disqualified

leaseback or long-term agreement, or

　　(B) such agreement does not provide for the allocation referred to in paragraph (1)(A).

　　(4) DISQUALIFIED LEASEBACK OR LONG-TERM AGREEMENT.--For purposes of this subsection, the term "disqualified leaseback or long-term agreement" means any section 467 rental agreement if--

　　(A) such agreement is part of a leaseback transaction or such agreement is for a term in excess of 75 percent of the statutory recovery period for the property, and

　　(B) a principal purpose for providing increasing rents under the agreement is the avoidance of tax imposed by this subtitle.

　　(5) EXCEPTIONS TO DISQUALIFICATION IN CERTAIN CASES.--The Secretary shall prescribe regulations setting forth circumstances under which agreements will not be treated as disqualified leaseback or long-term agreements, including circumstances relating to--

　　(A) changes in amounts paid determined by reference to price indices,

　　(B) rents based on a fixed percentage of lessee receipts or similar amounts,

　　(C) reasonable rent holidays, or

　　(D) changes in amounts paid to unrelated 3rd parties.

The parties disagree over whether the lease agreement is a disqualified leaseback or long-term agreement described in section 467(b)(4).[12]　In advancing their respective positions

---

[12]　Respondent's primary position in the FPAA was that for 1988 Partnership was required to accrue rent under the lease agreement in an amount equal to 6.5 (viz, the number of months remaining in 1988 after the execution of the lease agreement on June 14, 1988)

(continued...)

regarding that dispute, the parties focus on the 11.5-month period of zero rent provided in the lease agreement.

Petitioner argues that the 11.5-month period of zero rent is a reasonable rent holiday described in section 467(b)(5)(C) and that, accordingly, the lease agreement is not to be treated as a disqualified leaseback or long-term agreement.

Respondent concedes in her opening brief that

> If petitioner can establish that the absence of rental income during this [11.5-month] period [of zero rent] qualifies as a reasonable rent holiday under the Code, then the Partnership's deferral of this income will not be deemed primarily for tax avoidance purposes. In such a case, the Partnership would be entitled to report the rental income under the economic accrual method pursuant to the terms of the lease agreement.[13]

---

[12](...continued)
times the average monthly rent payment due over the entire lease term. On brief, respondent abandons that position and relies solely on her alternative position in the FPAA that Partnership must accrue rent under the lease agreement according to the constant rental accrual method prescribed in sec. 467(b)(2) because the lease agreement constitutes a disqualified leaseback or long-term agreement as defined in sec. 467(b)(4).

[13] We construe the above-quoted concession of respondent to be a concession by her that increasing rents, if any, under the lease agreement that are not attributable to the 11.5-month period of zero rent were not provided for a principal purpose of avoiding tax under sec. 467(b)(4)(B). Other statements by respondent that concede this point include the following statement in her answering brief:

> In addition, at pages 16-17 of its opening brief, petitioner attempts to prove the nonexistence of a tax-avoidance motive by emphasizing why the lease was justified in increasing lease payments in year 12 of the lease, and petitioner's expected increases in projected cash flows from future subleases when the building was expected to be
>
> (continued...)

However, respondent contends that the 11.5-month period of zero rent does not qualify as a reasonable rent holiday described in section 467(b)(5)(C).[14]

---

[13](...continued)
fully occupied.  The problem with petitioner's arguments is that they attempt to prove a non-tax avoidance motive for periods and events that occur _after_ the first 11.5 months of the lease.  Petitioner must justify the fact that the nonpayment of rent during the first 11.5 months of the lease did not have tax avoidance as its primary motive. What happens in year 12 and petitioner's expectations for increases in cash flows from future subleases when the building is occupied have nothing to do with the forgive- ness of rent during the first 11.5 months of the lease.  At least, petitioner has not established this relationship. The key point here is the reasons given by petitioner do not establish a business purpose or tax-independent motive for the nonpayment of rent during the critical time period in dispute.  In essence, petitioner's explanation of future events is just not focused on the period of time and the issue before the Court.

[14] Respondent also makes various assertions in her answering brief about "several major distortions or unexplained spikes [on February 1 of each of the 22-annual lease periods following the 11.5-month period of zero rent] in the rental payments over the long term of the lease" that she alleges are provided in the rental payment schedule and argues from those assertions that

Schedule E cannot be said to relate to the terms of the lease agreement because of the unexplained distortions described above.  This is because the lease (Jt. Ex. 9-I, pp. 17-18, ¶ 4.1) basically provides that annual rent is equal to the lower of fair market rental or 90% of the average basic rent.  This latter description of rent under the lease agreement in no way covers, explains, or relates to the several up-and-down increases in rental payment over the term of the lease.  Therefore, since each of the rental payments was not allocated according to the actual terms of the lease agreement, the rent leveling and present value principles of I.R.C. § 467(b)(2) and § 467(e) apply.

Although it is not altogether clear what respondent intends to
(continued...)

Respondent further asserts, apparently as an alternative

---

[14](...continued)
suggest in the foregoing excerpt from her answering brief, apparently respondent believes that it supports her position that, under the facts and circumstances presented here, not only does the 11.5-month period of zero rent not qualify as a reasonable rent holiday described in sec. 467(b)(5)(C), it also was granted for a principal purpose of tax avoidance. Although we deal below with those contentions, we note that if respondent also is suggesting by the foregoing passage from her answering brief that the lease agreement does not provide for the allocation of rent referred to in sec. 467(b)(1)(A), see sec. 467(b)(3)(B), we find any such suggestion to be contrary to the parties' stipulation that "The Lease Agreement sets forth as Schedule E a schedule that allocates the rental payments for the entire lease period, providing for the amount of the rental payments and specifying the due date for each month." See Piccadilly Cafeterias, Inc. v. United States, ___ Fed. Cl. ___ (Aug. 19, 1996).

We also note that the reasons quoted above that are relied on by respondent for respondent's conclusion that "Schedule E cannot be said to relate to the terms of the lease agreement" cite provisions in the lease agreement that we do not find relevant to that inquiry. The provisions in the lease agreement on which respondent relies that require the basic rent to be equal to the lower of fair market rental and 90 percent of the average monthly installment of basic rent paid by the lessee during the lease term are to apply only to each of the first six extensions of that lease term, if any, and were not prescribed in Schedule E. Schedule E set forth a schedule of basic rental payments only for the lease term of the lease agreement that started on June 17, 1988, and ends on June 1, 2013. Moreover, pursuant to the lease agreement, any extensions of the lease term were to occur only at the option of the lessee, that is to say, only if the lessee elected at the times and on the terms prescribed in the lease agreement to extend the lease term beyond June 1, 2013. In this connection, sec. 467(e)(6) provides that, except as provided in regulations prescribed by the Secretary, there shall not be taken into account in computing the term of any agreement for purposes of sec. 467 any extension that is solely at the option of the lessee. The Secretary has promulgated no regulations under sec. 467(e)(6) that apply to the instant case. See infra note 15.

argument, that even if the Court were to hold that the 11.5-month period of zero rent provided in the lease agreement is a reasonable rent holiday described in section 467(b)(5)(C) and/or was not granted for a principal purpose of tax avoidance so that Partnership shall accrue rent for 1988 under the lease agreement by allocating that rent in accordance with that agreement as provided in section 467(b)(1)(A), and not pursuant to the constant rental accrual method as provided in section 467(b)(2), Partnership nonetheless would be required for 1988 to accrue rent under section 467(b)(1)(A) in an amount at least equal to the amount of the Partnership letter of credit (viz, $8,872,245) that BCE delivered to Partnership.

Reasonable Rent Holiday--Section 467(b)(5)(C)

The Code does not define what is meant by the term "reasonable rent holidays" in section 467(b)(5)(C).[15] However, the

---

[15] Although sec. 467(b)(5) required the Secretary to issue regulations prescribing circumstances relating to, inter alia, reasonable rent holidays under which agreements will not be treated as disqualified leaseback or long-term agreements, no regulations were issued under sec. 467 until June 3, 1996. On that date, respondent issued proposed regulations under sec. 467 that do not apply to (1) rental agreements entered into prior to the date on which regulations under that section are published as final regulations in the Federal Register and (2) disqualified leaseback and long-term agreements entered into prior to June 3, 1996. Sec. 1.467-8, Proposed Income Tax Regs., 61 Fed. Reg. 27850 (June 3, 1996). Those proposed regulations, which are not in any event binding on the Court, Zinniel v. Commissioner, 89 T.C. 357, 369 (1987), do not apply to the lease agreement involved here that was entered into in June 1988, and nothing herein is intended to convey, and nothing herein should be

(continued...)

legislative history of the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 92(a), 98 Stat. 494, 610, which enacted section 467 into the Code, provides guidance as to the meaning of that term. The conference committee report (committee report) indicates in pertinent part:

> In addition, the conferees intend that the regulations will provide a safe harbor for leases under which no rent is payable (or is payable at a reduced rate) for a reasonable period of time after the inception of the lease. Whether the length of a "rent holiday" is reasonable will be determined by commercial practice in the locality where the use of the property will occur at the time the lease is entered into. The conferees expect that, in general, this rent holiday will not exceed twelve months, and in no event shall exceed twenty-four months. [H. Conf. Rept. 98-861, at 893 (1984), 1984-3 C.B. (Vol. 2) at 147.]

Respondent contends that, because the lease agreement does not label or refer to the 11.5-month period of zero rent as a "rent holiday", it can never qualify as a reasonable rent holiday described in section 467(b)(5)(C). Respondent's contention is baseless. As made clear in the committee report, the term "rent holiday" in section 467(b)(5)(C) simply means a period after the beginning of a lease during which either no rent is payable or rent is payable at a reduced rate. Id. See also Staff of the Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 290 (J. Comm.

---

[15](...continued)
construed as conveying, the Court's views with respect to any portion of those proposed regulations.

Print 1985). The 11.5-month period of zero rent provided in the lease agreement fits squarely within the definition of a rent holiday in the committee report, and it is not necessary for the lease agreement to label it as such.

Respondent also contends that the 11.5-month period of zero rent cannot qualify as a reasonable rent holiday described in section 467(b)(5)(C) because at the time Partnership and BCE entered into the lease agreement in June 1988 the inclusion of rent holidays in commercial leases was a reasonable and acceptable practice in the Denver office market only for commercial leases under which the lessees occupied the leased space, and the lease agreement was not such a lease. Rather, it was a master lease under which BCE, albeit the lessee, was not to occupy Republic Plaza except for a small amount of space; instead, BCE was to sublease space in that office building to other persons who were to occupy it.

To counter respondent's arguments and to support its position that the 11.5-month period of zero rent qualifies as a reasonable rent holiday described in section 467(b)(5)(C), petitioner relies, inter alia, on the opinions of two expert witnesses, Mr. Atkins and Mr. Whitcomb, who are qualified as experts in real estate appraisal and who prepared the Marshall and Stevens appraisal report.

We evaluate the opinions of experts in light of the quali-

fications of each expert and all other evidence in the record. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991); Parker v. Commissioner, 86 T.C. 547, 561 (1986).  We have broad discretion to evaluate "'the overall cogency of each expert's analysis.'"  Sammons v. Commissioner, 838 F.2d 330, 334 (9th Cir. 1988) (quoting Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), affg. in part and revg. in part on another issue T.C. Memo. 1986-318.  We are not bound by the formulae and opinions proffered by an expert, especially when they are contrary to our own judgment.  Orth v. Commissioner, 813 F.2d 837, 842 (7th Cir. 1987), affg. Lio v. Commissioner, 85 T.C. 56 (1985); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139.  Instead, we may reach a decision based on our own analysis of all the evidence in the record. Silverman v. Commissioner, supra at 933.  The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based.  See Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244.  While we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any portion of such an opinion.

Parker v. Commissioner, supra at 562.  Furthermore, we may reject the opinion of an expert witness in its entirety.  See Palmer v. Commissioner, 523 F.2d 1308, 1310 (8th Cir. 1975), affg. 62 T.C. 684 (1974); Parker v. Commissioner, supra at 562-565.

We have evaluated the Marshall and Stevens appraisal report and the letters, opinions, and analyses of Mr. Atkins and Mr. Whitcomb, both of whom we found credible.  We found that report and those letters, opinions, and analyses to be cogent and persuasive, and we have relied on them in making our findings herein.

According to Mr. Atkins, at the time the lease agreement was signed in June 1988, lessors in the Denver office market were typically offering 6 months of free rent on 5-year leases and 12 months of free rent on 10-year leases.  In the opinion of Mr. Atkins, the 11.5-month period of zero rent provided in the lease agreement was consistent with reasonable and acceptable practice in the Denver office market at the time that lease agreement was executed.[16]  According to Mr. Atkins, it was a reasonable and

---

[16]  Although Mr. Atkins did not identify a situation in the Denver office market of a rent holiday being offered in a lease under which the lessee did not occupy the leased space, he did identify two situations in localities outside that market in which lessees who did not occupy the leased spaced received rent holidays and discussed, but did not identify because of con- straints imposed on him regarding their confidentiality, certain other situations of which he was aware in which lessees received rent holidays and did not occupy the leased space.  According to Mr. Atkins, those situations about which he testified were

(continued...)

acceptable practice throughout the commercial real estate industry, including in the Denver office market, for Partnership to provide an 11.5-month period of zero rent in the lease agreement in order to induce the lessee, BCE, to sign the lease agreement which covered approximately 25 years and under which BCE, and not Partnership, assumed the risk of subleasing the building at a time when about 29 percent of it was vacant.[17]

---

[16](...continued)
illustrative of commercial practice in the Denver office market at the time Partnership and BCE entered into the lease agreement. In Mr. Atkins' opinion, at the time the lease agreement was executed, granting rent holidays like the 11.5-month period of zero rent provided in the lease agreement to lessees who did not occupy the leased space was a reasonable and acceptable practice in the Denver office market.

[17]  According to Mr. Atkins, a period of free rent with respect to leased space is equivalent to having a vacancy for that period because no rent is being paid with respect to that space.  He indicated that the average vacancy rate for leased space over the term of a lease can be calculated by comparing the length of a period of free rent to the total term of the lease.  Thus, for example, if a 5-year lease were to provide for 6 months of free rent, that would be equivalent to having an average vacancy rate of 10 percent over the term of the lease.  Providing the 11.5-month period of zero rent in the lease agreement, which covered approximately 25 years, was equivalent to an average vacancy rate of approximately 3.8 percent over the lease term.  In the opinion of Mr. Atkins, Partnership experienced less risk (viz, an average vacancy rate of only 3.8 percent over the lease term) by executing the lease agreement with the 11.5-month period of zero rent than if it had assumed and retained the risk of leasing Republic Plaza, including the approximately 29 percent that was vacant at the time the lease agreement was executed, to one or more lessees who intended to occupy the building.  BCE, as sublessor, assumed the risk of leasing the approximately 29 percent of Republic Plaza that was unoccupied when the lease agreement was executed. That risk included its incurring expenses in order to attract tenants, such as providing improvements to the unleased, vacant
(continued...)

The 11.5-month period of zero rent granted to BCE by the lease agreement enhanced the ability of BCE, as sublessor, to grant rent holidays that were consistent with commercial practice in the Denver office market to prospective lessees in Republic Plaza.  In fact, prior to the execution of the lease agreement, the lessor of Republic Plaza had granted periods of free rent as concessions to lessees and, according to the Marshall and Stevens appraisal report, it was expected that that practice in Republic Plaza and in other office buildings in the Denver office market would continue for a few years after the execution of the lease agreement.

Mr. Whitcomb provided additional support for petitioner's position regarding the 11.5-month period of zero rent.  In a letter he prepared with respect to a sale-leaseback transaction involving persons unrelated to Partnership, he concluded that a 12-month rent holiday at the beginning of a 27-year lease, under which the lessee was responsible for paying rent on the entire leased building, was a reasonable and acceptable practice for inducing a lessee to enter into such a lease.  Mr. Whitcomb testified that his conclusion in that letter would not have changed if the lessee had not been planning to occupy the leased premises, but had intended to act only as a sublessor.

[17](...continued)
space in Republic Plaza and granting rent holidays at the inception of subleases.

Although respondent contends that the 11.5-month period of zero rent was inconsistent with commercial practice in the Denver office market at the time the lease agreement was executed because it was included as part of a master lease, she has not established that contention as fact. Indeed, her contention is refuted by the record herein. On that record, we have found that providing the 11.5-month of zero rent in the lease agreement was consistent with reasonable and acceptable practice throughout the commercial real estate industry, including the Denver office market, at the time the lease agreement was executed.[18]

To counter petitioner's contention that the 11.5-month period of zero rent qualifies as a reasonable rent holiday described in section 467(b)(5)(C) because it was consistent with commercial practice in the Denver office market at the time the lease agreement was signed, respondent contends that the committee report provides that only the determination of whether the duration of a rent holiday is reasonable is to be determined based on commercial practice in the locality where the property is to be used. From that premise, respondent asserts that, even though the length of the 11.5-month period of zero rent is, in

---

[18] In assisting PFI in evaluating its proposed investment in Republic Plaza, Marshall and Stevens drew no distinctions between master leases of the type involved in this case and other types of leases with respect to the granting of rent holidays. That was obviously because, in their opinion, there are no such distinctions that should be made.

fact, reasonable based on commercial practice in the Denver office market, petitioner must nonetheless establish a nontax business purpose for Partnership's granting that rent holiday in order for it to qualify as a reasonable rent holiday described in section 467(b)(5)(C).  It is not clear to us what respondent means by this assertion.

If it is respondent's position that petitioner must establish the commercial reasonableness in the Denver office market of not only the duration of the rent holiday at issue, but also the granting of, and the amount of rent reduction during, that rent holiday, we agree.  If it is respondent's position that petitioner must establish a nontax business purpose for the granting, the duration, and the amount of the rent holiday at issue other than to conform to commercial practice in the Denver office market at the time the lease agreement was executed, we disagree.  Any such position would be contrary to the concept of, and the reasons for enacting, a "safe harbor" provision like section 467(b)(5)(C) and is not supported either by the language of the safe-harbor provision in question (i.e., section 467(b)(5)(C)) or its legislative history.

We have found on the record before us that at the time the lease agreement was executed Partnership was aware of, inter alia, the condition of the Denver office market and the practice in that market of offering rent holidays and other lease conces-

sions to attract lessees.  We have also found that at the time Partnership and BCE entered into the lease agreement in June 1988 it was a reasonable and acceptable practice throughout the commercial real estate industry, including the Denver office market which generally was suffering from high vacancy rates, to grant an 11.5-month period of free rent in commercial leases such as the lease agreement involved here, where the lease term covered about 25 years and the lessee assumed the risk of sub-leasing the approximately 29 percent of unleased, vacant space in the building.

Based on our examination of the entire record before us, we find that the 11.5-month period of zero rent provided by the lease agreement qualifies as a reasonable rent holiday described in section 467(b)(5)(C).  Respondent concedes that if the Court were to so find, "Partnership would be entitled to report the rental income under the economic accrual method pursuant to the terms of the lease agreement."[19]  Accordingly, pursuant to that concession, Partnership shall accrue rent for 1988 under the lease agreement in accordance with that agreement as provided in section 467(b)(1)(A).

---

[19]  In light of our finding that the 11.5-month period of zero rent qualifies as a reasonable rent holiday described in sec. 467(b)(5)(C) and respondent's concession, we shall not consider petitioner's additional arguments that the basic rent to be paid by BCE under the lease agreement satisfies the guidelines of Rev. Proc. 75-21, 1975-1 C.B. 715, and that, under the facts and circumstances presented here, tax avoidance was not a principal purpose for providing for increasing rents under the lease agreement.

Partnership Letter of Credit

Although the parties stipulated that the lease agreement set forth as Schedule E a schedule that allocates the rental payments for the entire lease term, specifying the amounts and due dates of such payments, respondent nonetheless argues that if the Court were to hold that the 11.5-month period of zero rent is a reasonable rent holiday described in section 467(b)(5)(C), Partnership would be required for 1988 to accrue rent under section 467(b)(1)(A) in an amount at least equal to the amount of the Partnership letter of credit (viz, $8,872,245) that BCE delivered to Partnership. Because we have some difficulty in understanding respondent's argument, we shall quote it in pertinent part:

> respondent asserts that the lease allocates at least $8,872,245.00 to the first 11.5 months of the lease by providing for a letter of credit. The letter of credit was delivered by the lessee, BCE, to the petitioner, dated June 15, 1988, in the amount of $8,872,245.00. (Stip. ¶ 26, Jt. Ex. 7-G), and the lease agreement itself [sic]. (Jt. Ex. 9-I).

> Pursuant to the specific provisions of the lease agreement * * * the lessee is specifically required to deliver a letter of credit to secure payment of the basic rent under the lease in the event the lessee defaults on its lease payments. Furthermore, the time period covered by this letter of credit is from June 15, 1988, the date the lessee delivered the letter of credit to the petitioner * * * until June 30, 1989. * * *. Not coincidentally, the time period covered by the letter of credit equates to the 11.5-month rent holiday claimed by the petitioner.

> Clearly, by its very terms, the existence of the letter of credit indicates that rent is not forgiven in the first year of the lease in the event the lessee defaults. Under the lease, the letter of credit se-

cures the payment of rent during the first 11.5 months of the lease in the amount of $8,872,245.00. It is incongruous for petitioner to argue that zero rent is allocated to the first 11.5 months of the lease when the letter of credit is clearly a provided-for substitute in the form of security for any rent that is not paid during this period in the amount of $8,872,245.00. Therefore, under the terms of the lease agreement, at least $8,872,245.00 is allocated to the lease term and must be accrued by petitioner in the first 11.5 months of the lease, if the Court finds that the parties to the lease should have followed the allocations made under the lease under I.R.C. § 467(b)(1)(A).

In addition to being difficult to comprehend, the foregoing argument of respondent regarding the Partnership letter of credit is premised upon certain allegations of fact that are not established by the record herein. In this regard, it will be helpful to quote pertinent portions of the lease agreement. That agreement recited:

> 53. LETTER OF CREDIT. As security for the payment of Basic Rent, Lessee has delivered a letter of credit (herein, such letter of credit, and each extension or replacement thereof pursuant to this Section 53, is called the "Letter of Credit") in the aggregate amount equal to $8,872,245, with an expiry date of June 30, 1989, issued by Canadian Imperial Bank of Commerce ("CIBC") and Citicorp Real Estate, Inc., and with the Lessor * * * as beneficiary, which Letter of Credit may be assigned for collateral purposes by the Lessor to Canadian Imperial Bank of Commerce * * *.

> In addition to the foregoing, at least forty (40) days prior to the expiration of the first, second and third Lease Years (hereinafter defined), except to the extent that any prior Letter of Credit shall have been drawn up, Lessee shall likewise deliver to the beneficiary [Partnership] an extension of or replacement for the Letter of Credit in an aggregate amount * * * equal to the following * * *.

> * * * * * * *

Lessor has collaterally assigned its rights in the Letter of Credit * * * under this <u>Section 53</u> to Canadian Imperial Bank of Commerce and in accordance with such collateral assignment, Lessor hereby directs Lessee: to deliver the initial Letter of Credit and any extension thereof or replacement therefor directly to Canadian Imperial Bank of Commerce to be held as collateral by such Bank on Lessor's behalf with a copy thereof to Lessor.

Respondent alleges that specific provisions of the lease agreement required BCE to deliver to Partnership the Partnership letter of credit that was effective on June 15, 1988. It is the purchase agreement, and not the lease agreement, that required BCE to deliver that letter of credit to Partnership, although the lease agreement contemplated that such letter of credit had been delivered.[20]

As required by TIAA, the purchase agreement required that, as of the closing of that agreement, (1) Partnership deliver to

---

[20] As a further illustration of certain inaccurate factual allegations made by respondent in advancing her position with respect to the Partnership letter of credit, we note that, contrary to respondent's assertion that "the time period covered by the [Partnership] letter of credit equates to the 11.5-month rent holiday claimed by the petitioner", the initial Partnership letter of credit was issued effective June 15, 1988, and had an expiry date of Mar. 1, 1989. Even if that letter of credit had had the expiry date of June 30, 1989, that was recited in the lease agreement quoted above, the period covered by it would not, contrary to respondent's assertion, "equate * * * to the 11.5-month rent holiday claimed by the petitioner", since that period of zero rent began on June 17, 1988, and ended on May 31, 1989. We also note that, contrary to certain recitations in the lease agreement quoted above, the Partnership letter of credit that was in fact delivered to Partnership and assigned to CIBC, as required by the purchase agreement, was issued only by CIBC, and not by CIBC and Citicorp Real Estate, Inc.

TIAA the TIAA letter of credit for the benefit of TIAA in order to secure payment of Partnership's obligations under the TIAA term loan, (2) BCE deliver to Partnership the Partnership letter of credit for the benefit of Partnership in order "to secure the Partnership's obligations under the TIAA Letter of Credit", and (3) Partnership collaterally assign the Partnership letter of credit to CIBC. Although the lease agreement recited that the Partnership letter of credit that BCE delivered to Partnership, as required by the purchase agreement, was to serve as security for BCE's obligations under the lease agreement, including its obligation to pay rent, the purchase agreement is the operative document that obligated BCE to deliver the Partnership letter of credit to Partnership and that obligated Partnership to assign collaterally the Partnership letter of credit to CIBC.[21]

---

[21] Under the lease agreement, BCE was required to extend the Partnership letter of credit periodically through a date not to exceed 60 days after Apr. 30, 1991. Thus, the Partnership letter of credit related to certain annual lease periods following the 11.5-month period of zero rent. We believe that when the lease agreement recited that the Partnership letter of credit was delivered as security for the payment of basic rent, it was referring to the annual lease periods following the 11.5-month period of zero rent that ended no later than June 30, 1991, during which the lease agreement obligated BCE to pay monthly prescribed amounts of basic rent, and not to the first 11.5 months of the lease term during which BCE was not obligated by that agreement to pay any rent. We also note that, during the 11.5-month period of zero rent, the TIAA letter of credit and the Partnership letter of credit, both of which were effective on June 15, 1988, were intended to secure the obligation of BCE and/or of PFI, the partners of Partnership, to make additional capital contributions to Partnership during that period as

(continued...)

On the entire record before us, we find that the lease agreement did not allocate rent to the 11.5-month period of zero rent in an amount equal to the Partnership letter of credit (or in any other amount) and that Partnership is not required for 1988 to accrue as rent the amount of that letter of credit.

To reflect the foregoing and the concessions of the parties,

Decision will be entered under Rule 155.

---

[21](...continued)
required by the partnership agreement in order to service the TIAA term loan.