T.C. Memo. 2019-120

UNITED STATES TAX COURT

WP REALTY, LP, OLYMPIA REALTY, INC., TAX MATTERS PARTNER,
Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27213-16.                          Filed September 16, 2019.

Steven Todd Miller, Jeremy M. Fingeret, and Robert G. Wonish II, for petitioner.

Candace M. Williams, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, Judge: This case was commenced in response to a Notice of Final Partnership Administrative Adjustment (FPAA), dated September 26, 2016, issued to Olympia Realty, Inc. (Olympia), as the tax matters partner of WP Realty, LP (WP Realty), for tax years 2011, 2012, 2013, and 2014 (years in issue). In the

[*2] FPAA the Internal Revenue Service (IRS or respondent) disallowed deductions for losses from a trade or business of $3,137,519, $2,876,390, $3,991,889, and $4,329,800 for tax years 2011, 2012, 2013, and 2014, respectively.

The sole issue for our consideration is whether WP Realty engaged in the activity of operating a golf course with the objective of making a profit under section 183. Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the tax years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts and attached exhibits are incorporated herein by this reference. When the petition was timely filed, WP Realty's principal place of business was in Texas.

WP Realty is a limited partnership formed under the laws of the State of Texas. It operates as the owner and developer of Whispering Pines Golf Club (Whispering Pines). WP Realty elected to be treated as a partnership for Federal income tax purposes for the years in issue.

**[*3]** Olympia is the general partner of WP Realty and owns a 1% interest. Corbin Robertson is the limited partner and owns the remaining 99% interest. Olympia, a Texas corporation, is an S corporation for Federal tax purposes and is wholly owned by Olympia Enterprises, Inc. (OE). Robertson is the sole owner of OE, an S corporation for Federal tax purposes.

I.     Robertson's Background

During the years in issue Robertson served as the chief executive officer and chairman of the board of directors of two companies publicly traded on the New York Stock Exchange: Quintana Energy Services, Inc., an oil field service company, and Natural Resource Partners, LP, a master limited partnership. During the years in issue Robertson's adjusted gross income was as follows:

| Year | Adjusted gross income |
|------|----------------------|
| 2011 | $28,789,672 |
| 2012 | 106,622,871 |
| 2013 | 37,351,629 |
| 2014 | 20,046,983 |

Robertson made investments in real estate during his business career. From 1969 until 1983 he was the director of the Cullen Center, a mixed-use real estate development which included a hotel, near downtown Houston, Texas. The

[*4] development was a family-owned investment consisting of 2.5 million square feet of office space and hotel rooms. The hotel was never profitable the entire time Robertson's family owned the property. However, the Cullen Center, including the hotel, was sold at a profit in 1983.

Robertson was also a partner in and director of Northwest Crossing near Houston. He installed the infrastructure and sold off parcels for individual development. Robertson profited from selling lots at Northwest Crossing.

In 1983 Robertson began developing Davenport Ranch, a golf course and residential community in Austin, Texas. In designing the golf course at Davenport Ranch, Robertson worked with course architect Pete Dye, an accomplished golf course architect, to understand the contours of routing the course in accord with the topography of the land. Austin Country Club moved its operations to Davenport Ranch, and it had approximately 700 members, including well-known professional golfers.

Having Austin Country Club operate on Davenport Ranch provided a profitable membership base. Members of Austin Country Club were interested in purchasing residential lots. The sale of the residential lots took longer than expected because of the economic downturn in Texas in the 1980s. The project

[*5] was not debt financed, and Robertson believes that is why the project did not fail. The final residential lots were sold in the late 1990s.

Robertson also was a joint developer of Bear Creek Community (Bear Creek), a residential community adjacent to two public golf courses in Houston. Bear Creek took approximately 10 years to be profitable.

II.    Background of Whispering Pines

In 1968 Robertson and a friend founded Camp Olympia, an overnight camp for inner-city youth, in Trinity County, Texas, a rural area roughly 90 miles north of Houston. This area was isolated and underdeveloped. Two years later Robertson purchased over 660 adjacent acres, which became the site of Whispering Pines.

Golf has been taught at Camp Olympia since the 1970s. In the early 1990s timber was removed from the adjacent acreage and Camp Olympia used a portion of that tract to practice golf. A golf adviser to Camp Olympia suggested that the tract could be turned into an 18-hole golf course. Three holes were built, and Robertson did more research about developing a golf course.

Chet Williams of Jack Nicklaus Productions was hired to formally lay out and design an 18-hole championship golf course. Williams has designed more than 30 golf courses. Course construction was completed in 2000, and

**[*6]** Whispering Pines officially opened. During course construction Robertson contacted a developer to discuss the routing of the course for future residential development.

Robertson wanted to promote amateur golf and create an international amateur golf championship. To further these efforts he created World Health and Golf Association, which changed its name to Spirit Golf Association (SGA) in 2011. SGA was incorporated on April 7, 1999, as a nonprofit corporation under the laws of the State of Texas. At this point Robertson planned on donating the land, including the golf course, to charity.

In June 1999 SGA applied to the IRS for tax-exempt status under section 501(a) as a corporation that would foster national and international amateur competition by conducting an amateur golf championship and supporting and developing amateur athletes. The application explained that excess funds would be used to promote charitable and educational activities within the meaning of section 501(c)(3). On January 13, 2000, the IRS denied SGA's application for tax-exempt status, determining that a substantial purpose of the organization was providing a club facility rather than exclusively supporting charitable or educational purposes. On February 11, 2000, SGA protested that it was organized and would be operated exclusively to foster national and international amateur

**[*7]** golf.  The protest letter stated there was no potential for real estate development adjacent to the golf course.

After further discussions the IRS approved SGA's tax-exempt status in April 2000.  The approval reflected a compromise between the IRS and SGA.  SGA would focus solely on charitable activities, including hosting the Spirit World Amateur Golf Championship (Spirit Golf Tournament) and other amateur events and distributing funds to the Texas Medical Center.  SGA would not own or operate assets of the golf course.  To reflect the compromise SGA and Olympia would enter into a nonexclusive lease agreement in which SGA would have access to the golf course and facilities.  On June 1, 2000, Olympia entered into separate lease agreements with SGA and Camp Olympia.

III.    WP Realty

After an agreement was made regarding the charitable status of SGA, Robertson changed his plans for Whispering Pines.  It was now going to be a for-profit course.  In August 2001 Robertson and Olympia formed WP Realty.  As the limited partner Robertson contributed a promissory note of approximately $16 million.  Olympia contributed to WP Realty the golf course, which consisted of approximately 520 acres, the golf house, maintenance buildings, and related equipment.

[*8]  Since 2005 Robertson made the following capital contributions to WP

Realty:

| Year | Capital contributions |
|------|----------------------|
| 2005 | $2,726,679 |
| 2006 | 2,253,322 |
| 2007 | 3,102,446 |
| 2008 | 4,797,843 |
| 2009 | 2,756,914 |
| 2010 | 2,572,096 |
| 2011 | 3,251,232 |
| 2012 | 10,933,256 |
| 2013 | 22,497,000 |
| 2014 | 11,616,953 |
| 2015 | 9,895,626 |
| 2016 | 476,752 |
| Total | [1]76,880,119 |

[1]The parties stipulated that Robertson's total capital contributions were approximately $101 million.

On September 19, 2001, Olympia assigned both the SGA and the Camp

Olympia lease to WP Realty.  For the years in issue SGA and Camp Olympia paid

rent to WP Realty as follows:

**[*9]**

| Year | Rent paid by SGA | Rent paid by Camp Olympia |
|------|------------------|---------------------------|
| 2011 | $500,000 | $175,000 |
| 2012 | 500,000 | 175,000 |
| 2013 | 500,000 | 175,000 |
| 2014 | 558,335 | 175,000 |

A.     SGA Membership

Eric Fredricksen was director of SGA during the years in issue. His role was to run the Spirit Golf Tournament and to manage the SGA membership program at Whispering Pines. He reported to the founder, Robertson, and SGA's board of governors, which consisted of a mix of individuals who had experience with charities or golf.

An SGA membership was required to play golf at Whispering Pines. Members of SGA paid annual membership fees that entitled them to a set number of rounds of golf at Whispering Pines. Fifty percent of each annual membership fee was acknowledged as a charitable contribution.

The set number of rounds allotted for each membership category was calculated by dividing half of the membership fee by the cost per round of golf negotiated between WP Realty and SGA in the lease agreement. For 2007-10 an

[*10] individual membership cost $10,000, and the member was entitled to 33 rounds of golf.  For the years in issue an individual membership cost $12,000, and the member was entitled to 40 rounds of golf.  In 2015 the cost of an individual golf membership increased to $15,000, resulting in 45 rounds of golf.

After reaching the threshold of allotted golf rounds, members had the option to either reduce their charitable contributions by additional rounds of golf played or pay set fees for additional rounds.  For 2007-13 members reduced their charitable contributions by $150 per round after reaching the number of rounds allotted or paid $150 per round.  For 2014-15 members paid $250 per additional round.

SGA offered various types of memberships, including individual, national,[1] and corporate.  A corporate membership allowed up to eight employees to be designated as members of SGA.  Membership revenue was $660,000 in 2000 and increased each year.  The table below provides an annual summary of individual membership costs, the number of individual members, national membership costs, the number of national members, corporate membership costs, the total number of members, and total revenue from membership:

---

[1]Starting around 2007 the criteria for a national member changed.  It became a membership for those who were not Texas residents.

**[*11]**

| Year | Individual membership cost | Number of individual members | National membership cost | Number of national members | Corporate membership cost | Total members[1] | Total membership revenue |
|---|---|---|---|---|---|---|---|
| 2003 | $5,000 | 186 | n/a | n/a | $25,000 | 201 | $1,395,000 |
| 2004 | 10,000 | 80 | $5,000 | 10 | 25,000 | 113 | 1,435,000 |
| 2005 | 10,000 | 81 | 5,000 | 31 | 25,000 | 135 | 1,555,000 |
| 2006 | 10,000 | 69 | 5,000 | 46 | 25,000 | 149 | 1,560,000 |
| 2007 | 10,000 | 70 | 6,000 | 46 | 25,000 | 161 | 1,695,500 |
| 2008 | 10,000 | 73 | 6,000 | 51 | 25,000 | 172 | 1,845,500 |
| 2009 | 10,000 | 82 | 6,000 | 65 | 25,000 | 183 | 1,817,000 |
| 2010 | 10,000 | 82 | 6,000 | 70 | 25,000 | 196 | 2,030,000 |
| 2011 | 12,000 | 82 | 10,000 | 45 | 30,000 | 165 | 2,284,000 |
| 2012 | 12,000 | 82 | 10,000 | 45 | 30,000 | 174 | 2,522,000 |
| 2013 | 12,000 | 128 | n/a | n/a | 30,000 | 178 | 2,724,000 |
| 2014 | 12,000 | 129 | n/a | n/a | 30,000 | 182 | 2,814,000 |
| 2015 | 15,000 | 118 | n/a | n/a | 35,000 | 170 | 3,307,500 |
| 2016 | 15,000 | 153 | n/a | n/a | 35,000 | 220 | 4,067,500 |
| 2017 | 15,000 | 145 | n/a | n/a | 35,000 | 214 | 4,122,500 |
| Total | | | | | | | 35,174,500 |

[1]This table does not include (1) all types of memberships offered, (2) the number of members in each category, or (3) the cost of each membership type.

SGA also offered sponsorships of the Spirit Golf Tournament, which it had hosted since 2001. SGA was responsible for the operation of the Spirit Golf Tournament, which occurred every other year. These sponsorships include rounds of golf at Whispering Pines, and SGA allocated funds to WP Realty for these

[*12] rounds of golf. The following table summarizes the total number of

sponsors and sponsorship revenue SGA received:

| Year | Total number of sponsors | Total sponsorship revenue |
|------|------|------|
| 2005 | 36 | $506,500 |
| 2007 | 59 | 592,200 |
| 2009 | 53 | 532,000 |
| 2011 | 50 | 751,000 |
| 2013 | 79 | 929,500 |
| 2015 | 80 | 1,499,500 |
| 2017 | 44 | 788,286 |

B.      Relationship Between WP Realty and SGA

The SGA board (board) consisted of individuals with a variety of

experience. The board had a lease committee that made recommendations to the

full board on the amount of the base rent and the cost per round. Two members of

the board were chosen to represent WP Realty's interest in lease negotiations. WP

Realty did not have representation independent from SGA during the lease

negotiations. Robertson did not participate in the lease negotiations. As part of

the compromise with the IRS Robertson recused himself from the discussion and

[*13] the vote on the lease arrangement between SGA and Olympia.[2] The agreement also required that the board be expanded so that a majority of the board members were independent.

The initial lease assigned to WP Realty was a nonexclusive lease that included a base rent of $800,000 per year and a usage fee of $130 for each round of golf played by an SGA member, a guest, or an invitee. WP Realty surveyed top-rated golf courses to determine the rate of a round of golf. The initial lease was amended and restated on June 1, 2004, and it stated that Whispering Pines was developed to be the home of SGA and the Spirit Golf Tournament. It provided a base rent of zero. Pursuant to the terms of the lease WP Realty would pay all operating expenses. The lease provided no fee per round of golf played by a member.

During the years in issue the 2004 lease agreement as amended on February 23, 2007, was in effect. The base rent remained zero and the lease included a usage fee of $150 for each round of golf played by an SGA member, a guest, or an invitee. The 2007 amended lease was not updated until 2014, and the second amended and restated lease was effective as of June 1, 2014. The 2014 lease provided a base rent of $600,000 per year and the usage fee was increased to $165.

_____

[2]Olympia assigned the lease to WP Realty.

[*14] An amendment to the 2014 lease was made on January 1, 2016. This amendment increased the rent to $350,000 per month and provided a formula for indexing the rent for inflation. No change was made to the usage fee.

Even though the lease provided for a base rate of zero during the years in issue, SGA paid rent to WP Realty each year. In addition to the base rent and usage fee per round, guest green fees were paid to WP Realty. During the years in issue SGA paid the following to WP Realty:[3]

| Year | Base rent | Rounds of golf SGA members played at Whispering Pines | Total SGA paid for base rent and rounds of golf |
|------|-----------|------------------------------------------------------|------------------------------------------------|
| 2011 | $500,000  | 4,010                                                | $1,161,650                                      |
| 2012 | 500,000   | 4,574                                                | 1,254,710                                       |
| 2013 | 500,000   | 4,735                                                | 1,281,279                                       |
| 2014 | 558,335   | 5,297                                                | 1,432,340                                       |

### C.  Business Plans

WP Realty did not borrow money to fund the operations of Whispering Pines. It received revenue from sources besides the rent that it received from SGA and Camp Olympia. For years 2005-16 Whispering Pines received revenue as follows:

---

[3]The parties agreed to the numbers in this table, which were taken from stipulated exhibits.

**[*15]**

| Year | Green fees | Food & beverage | Golf merchandise | Cottages |
|---|---|---|---|---|
| 2005 | $182,499 | $108,391 | $114,320 | [1]-0- |
| 2006 | 204,502 | 172,700 | 139,325 | $166,461 |
| 2007 | 683,011 | 148,085 | 206,804 | 186,285 |
| 2008 | 738,932 | 142,325 | 238,310 | 205,079 |
| 2009 | 758,478 | 242,224 | 277,665 | 196,250 |
| 2010 | 862,104 | 292,143 | 309,415 | 212,885 |
| 2011 | 849,923 | 279,067 | 338,600 | 203,858 |
| 2012 | 963,753 | 299,203 | 351,162 | 212,730 |
| 2013 | 975,228 | 319,396 | 441,434 | 217,770 |
| 2014 | 1,123,249 | 305,440 | 408,021 | 211,808 |
| 2015 | 1,168,540 | 404,400 | 458,218 | 227,407 |
| 2016 | ([2]) | 500,647 | 589,389 | 572,040 |
| Total | 8,510,219 | 3,214,021 | 3,872,663 | 2,612,573 |

[1]Revenue from cottages was not reported on WP Realty's 2005 profit and loss statement.

[2]Revenue from green fees was not available for 2016.

Once the decision was made that Whispering Pines would be run as a for-profit business, Robertson was unsure whether it was going to work because of its rural location so he decided to make improvements gradually. WP Realty had business plans for Whispering Pines drafted for 2004, 2007, and 2015-18. The business plans addressed ways to improve Whispering Pines' revenue streams.

[*16] The mission of WP Realty according to the 2004 business plan was "[t]o provide a World-Class recreational experience for the Members and Guests of the WHGA and Whispering Pines with a philanthropic Spirit to benefit the health and well-being of all who participate". The membership goal was to grow and maintain a number of members no greater than 1% below capacity. It identified growth in individual membership as one of WP Realty's areas of opportunity and stated that WP Realty wanted to reach 80 individual members and 20 corporate members by March 2004. The construction goals were to build and sell six cottages and complete construction of a clubhouse and town center. The financial goal was to break even between SGA and WP Realty while contributing to charity. The plan addressed increasing guest fees and cottage rates.

The 2007 future expansion business plan (2007 business plan) stated that the strategic plan "will solidify the foundation and infrastructure for the future of Whispering Pines Golf Club moving forward on a profitable self-sustaining basis". The 2007 business plan covered the years in issue. It included a section entitled "Alignment with WP Realty's Goals and Expectations", which listed the following: establish a membership that fosters an environment that projects a philanthropic endeavor and spirit; build, manage, and operate a first-class golf facility; operate a program to teach youth life skills through the game of golf; and

[*17] promote amateur golf for philanthropic purposes. It identified challenges pertaining to Whispering Pines' infrastructure, including the lack of cottages, a small golf house, and lack of a short game practice facility. The 2007 business plan also identified weaknesses, including the size of the kitchen space within the clubhouse and the lack of capacity to host overnight guests when occupancy levels were high.

The "Growth and Marketing Opportunities to Realize Additional Revenue" section of the 2007 business plan listed increasing corporate membership to 40. The corporate membership in 2007 was 18. It also suggested adding a new membership category, national member, for individuals living outside Texas. This membership would cost less than an individual membership. Another revenue growth opportunity identified was increasing cottage rental rates.

Unfortunately, after the 2007 business plan was in place, the economy struggled and the golf industry was affected. Not all of the goals of the 2007 business plan could be met. The town center, first proposed in the 2004 business plan, has not yet been built. However, building a town center is still a goal.

WP Realty's mission according to the 2015-18 business plan was "[t]o provide a world-class experience for the Members and Guests of the SGA and Whispering Pines with a philanthropic Spirit to benefit the health and well-being

[*18] of all who participate". An opportunity identified in the plan was the potential of increasing membership to expand the customer base. It included revenue goals that addressed increasing the number of rounds of golf played on the 18-hole course and the new 9-hole course completed in 2013, the allocated round amount, the guest paid amount, the number of cottages on site, and the rates charged for cottages. It called for increasing the rounds played on the 18-hole course by 12% per year and increasing the number of rounds played on the 9-hole course to one-third of the rounds played on the 18-hole course. Allocated round amounts were to increase by 10% every two years, and the guest paid amount was to increase by 5% annually. Rates for cottages were to increase by 5% annually.

Whispering Pines was a destination golf course because it is over 90 miles from a significant population center. Each of the business plans described how WP Realty could increase revenue by increasing its capabilities to host destination meetings, seminars, and corporate retreats. The 2004 business plan identified "corporate meetings and outings destination" as an opportunity for growth. The 2007 business plan called for marketing to businesses about the "increased capabilities for destination meeting[s, and] seminars".

**[*19]** D.    Improvements

Since 2007 numerous improvements have been made to Whispering Pines and the course itself.  Between 2007 and 2009 the golf maintenance facilities were updated at a cost of $708,000.  A new 8,750-square-foot administration building provided offices and lockers as well as a chemical room and an irrigation room.  This building also included a golf cart barn.  In 2009 WP Realty constructed an indoor golf teaching facility for approximately $38,000.

In 2010 WP Realty began constructing a nine-hole, par-three course that would allow guests to sharpen their short-game skills and increase the number of players per day that Whispering Pines could host.  The construction of this nine-hole course was part of the 2007 business plan.  Williams, who designed the 18-hole course, also designed the 9-hole course, which became known as the Needler.  It cost over $5 million and was completed in 2013.  With the addition of the Needler, WP Realty decided to improve and expand its irrigation facilities with the construction of the Gristmill in 2013.  WP Realty spent $1,249,000 to build the Gristmill, which served as a pump house for both courses.  The Gristmill, which is at the halfway point of the 18-hole course, also allowed golfers a place to rest and purchase food and beverages.

[*20] WP Realty built the Roost in 2013, which was an outdoor pavilion next to the Gristmill. Construction costs for the Roost were $816,000. The Roost provided a place for Whispering Pines to host events and serve food and beverages.

The 2007 business plan identified the need to improve the kitchen and dining facilities. Whispering Pines initially had a clubhouse with a kitchen that could accommodate only 32 guests. Spirit Hall, the new dining facility, was designed and built between 2012 and 2015 at a cost of $5.5 million. Spirit Hall can accommodate approximately 100 guests and has a commercial kitchen that is much larger than the original kitchen facility.

Throughout the years improvements were made to the 18-hole course. In 2012 renovations were made to the bunkers at a cost of $852,000. WP Realty invested $740,000 to improve the driving range and bunker practice area. Renovations were also made to the putting greens at cost of $145,000.

The 2004 and 2007 business plans identified the lack of accommodations for overnight guests as an area for improvement. In 2002 Olympia built 4 cottages on land it owned adjacent to the golf course and put in place infrastructure for approximately 18 cottages. Members of SGA were able to rent the cottages. In

[*21] marketing materials for Whispering Pines the cottages were featured in a brochure that advertised Whispering Pines as a destination for corporate retreats.

In 2015 WP Realty renovated the cart paths along the 18-hole course. The cost of the renovation was $425,223. Williams designed the layout of the renovated cart paths. The cart paths were renovated to connect tees to greens, which increased playing by allowing play on the course when it was wet.

In or around 2015 WP Realty and SGA created the Village Partner Program allowing SGA members and sponsors to fund the construction of new cottages at the Village at Whispering Pines in exchange for priority booking privileges and discounted room rates for 10 years. WP Realty solicited contributions of $20,000 each from 36 SGA members to build two new cottages between 2015 and 2016. The Village Partner Program covered approximately half of the construction costs. The goal of the Village Partner Program was to raise enough revenue to build four additional cottages.

E.   Role of Employees

WP Realty consistently hired experienced people to consult in planning, managing, and marketing Whispering Pines. In August 2004 Chris Rowe was hired as Whispering Pines' director of golf. Upon graduating from college in 1992 Rowe participated in Professional Golf Association educational programs. Before

[*22] joining Whispering Pines he was a golf pro at another golf club where he taught an average of 600 lessons per year.

In addition to providing lessons and clinics at Whispering Pines, Rowe invited course raters to visit Whispering Pines to help increase the course's ranking. He was involved with hosting SGA's Spirit Golf Tournament, held every other year. The Spirit Golf Tournament has been televised on the Golf Channel and NBC. It was played on the 18-hole course, and the participants were housed at Camp Olympia. Rowe also helped WP Realty host the 2004 National Collegiate Athletic Association (NCAA) Southland Conference Championship and the Men's NCAA Big 12 Conference Tournaments that were held in 2005, 2008, 2010, 2012, 2014, and 2016. WP Realty sought out the hosting of these other tournaments to increase Whispering Pines' national and international exposure in the golf community.

In an effort to increase Whispering Pines' brand recognition, course reputation, and customer base, every spring the Robertson Invitational (Invitational) was held at Whispering Pines. Rowe invited golf pros from 16 clubs around the country to participate in the Invitational. Each golf pro brought three guests, and the foursome played as a team.

[*23] In January 2001 Golf Digest ranked Whispering Pines third on its list of 10 best new private golf courses around the country. In 2011 Whispering Pines was ranked 11th in Golf Digest's Index of "America's 50 Greatest Golf Retreats". The Dallas Morning News listed Whispering Pines as the number one golf course in Texas from 2006 to 2010. Whispering Pines' location made it difficult to attract raters. Rowe helped Whispering Pines achieve these course rankings by contacting the rating publications and inviting course raters to come play at the course.

Derek Severns was Whispering Pines' first general manager. Before his employment at Whispering Pines Severns had been a golf club manager. Chad McCormick was hired in 2006 to replace Severns. Before joining Whispering Pines, McCormick had more than 10 years of experience working for different golf clubs around Texas. As general manager McCormick directed approximately 120 employees. He was responsible for putting together the 2007 business plan. After McCormick developed the 2007 business plan, he and Robertson discussed capital improvements and the timing of when to implement each project. McCormick identified certain challenges that Whispering Pines faced in attracting guests. Without sufficient overnight accommodations it was difficult to attract the

[*24] membership numbers needed to achieve profitability or raise revenue through food and beverage sales or more rounds of golf.

Each year McCormick put together an annual budget that included a budget from each department at Whispering Pines. Together McCormick and Robertson used those budgets as a guide for implementing projects identified in the 2007 business plan. They also relied on the profit and loss statements and other books and records kept by WP Realty's accounting department. Robertson reviewed the monthly profit and loss statements.

WP Realty hired Michael Dieckhoff as golf course superintendent in 2003. His experience included working at a Jack Nicklaus Productions course and Augusta National. Since 2001 Paula Johnson had served as controller for Whispering Pines. Previously, she worked at a golf club for five years. Johnson and her accounting team kept financial records for WP Realty, including general ledgers, balance sheets, profit and loss statements, book-to-tax reconciliations, and capital accounts. An executive chef was hired to oversee the food operations of Whispering Pines.

F.    Robertson Area

The only homesite at Whispering Pines is referred to as the "Robertson Area", which consists of multiple houses and buildings used exclusively by

[*25] Robertson and his family.  The table below summarizes the buildings at the Robertson Area and their costs:

| Name | Cost |
|------|------|
| Hedrick house | $1,119,348 |
| Lake house | 3,584,433 |
| Main house | 23,841,315 |
| Storage building | 299,059 |
| Pool | 935,075 |
| Total | 29,779,230 |

The main house and pool were completed in 2015.  Before the completion of the main house Robertson used a Victorian house, referred to as the "Hedrick house" in the above table, that he had moved to the property in 1978.  Robertson used the main house as a personal residence.

Robertson spent a considerable amount of time at Whispering Pines directing staff and accommodating the needs of SGA members and guests. Robertson's family used the Robertson Area approximately four to six times per year.  Robertson did not pay rent, nor was he charged for the use of the Robertson Area.  WP Realty billed and received reimbursement from Robertson for expenses

[*26] it paid on his behalf on a monthly basis. All expenses related to the Robertson Area were treated as personal expenses.

The lease between WP Realty and SGA, effective June 1, 2014, includes language addressing the Robertson Area. The lease provides that a portion of the premises was developed by WP Realty for the personal use of Robertson and his family. This area is not to be used by SGA, the lessee. At any time during the term of the lease WP Realty may unilaterally remove the Robertson Area from the premises, and the lease would be "automatically and unilaterally amended to exclude the Robertson area".

During the years in issue Robertson played 39 total rounds of golf, but he played only three of those rounds at Whispering Pines--once in 2012 and twice in 2013.

G.    Future Development

The formal layout of Whispering Pines kept open as an option the possibility of future homesites along the course. In anticipation of future homesites WP Realty installed the infrastructure to support residential development. In July 2014 Robertson engaged an appraiser. The appraisal was not completed until 2015.

[*27] In August 2014 Robertson commissioned Roy Bechtol to design a master plan for the development of homesites along the golf course. Bechtol has completed more than 20 golf course and land development projects, including the master plan at Davenport Ranch. Bechtol's master plan for Whispering Pines was completed in October 2014 and allowed for 273 single-family units around the golf course. The plan also included a layout for roads, a practice course, and a town center. No work has been done to implement the master plan.

IV.    Tax Returns

WP Realty timely filed Forms 1065, U.S. Return of Partnership Income, for the years in issue. WP Realty realized and recognized ordinary business losses for tax years 2004-16 as shown in the following table, which summarizes the annual gross income, deductions, depreciation, and ordinary business income or loss from WP Realty's Forms 1065 from 2004 through 2016:[4]

---

[4]The numbers in this chart were taken from WP Realty's Forms 1065. The "Deductions" column includes the deduction for depreciation for each year.

**[*28]**

| Year | Gross income | Deductions | Depreciation | Ordinary business income (loss) |
|------|-------------|------------|--------------|-------------------------------|
| 2005 | $691,757 | $3,523,935 | $615,841 | ($2,832,178) |
| 2006 | 802,341 | 3,766,934 | 507,630 | (2,964,593) |
| 2007 | 1,341,627 | 4,209,411 | 534,572 | (2,867,784) |
| 2008 | 1,906,288 | 4,838,043 | 518,716 | (2,931,755) |
| 2009 | 1,935,334 | 4,699,779 | 643,888 | (2,764,445) |
| 2010 | 2,302,440 | 4,781,666 | 633,722 | (2,479,226) |
| 2011 | 2,101,187 | 5,238,706 | 625,611 | (3,137,519) |
| 2012 | 2,274,118 | 5,150,508 | 692,793 | (2,876,390) |
| 2013 | 2,331,552 | 6,323,441 | 869,606 | (3,991,889) |
| 2014 | 2,531,030 | 6,860,830 | 1,109,469 | (4,329,800) |
| 2015 | 2,758,959 | 7,642,156 | 1,012,659 | (4,883,197) |
| 2016 | 6,542,886 | 6,986,338 | 1,190,598 | (443,452) |

WP Realty's losses flowed through to Robertson as the 99% limited partner in WP Realty and the ultimate sole owner of Olympia.

On May 15, 2014, respondent notified WP Realty of the audit of its tax returns for 2011-12. On April 21, 2015, respondent issued a draft notice of proposed adjustment notifying Olympia that losses realized in 2011-13 would be disallowed under section 183 because Whispering Pines was an activity not engaged in for profit. On September 26, 2016, respondent issued the FPAA disallowing WP Realty's reported losses for 2011-14 pursuant to section 183.

**[\*29]**                                 OPINION

Respondent determined that WP Realty's ownership and operation of Whispering Pines was an activity not engaged in for profit within the meaning of section 183 and disallowed deductions for the years in issue. Respondent contends that Whispering Pines remained in operation only because of the contributions of Robertson. Respondent's position is that Robertson operated WP Realty to the benefit of SGA and his motive was philanthropy and not profit. Petitioner counters that WP Realty operated Whispering Pines with an intent to realize a profit. The weakness in its position is the magnitude of losses. To prevail, petitioner must show a profit objective.

I.     Burden of Proof

Generally, the Commissioner's determinations in an FPAA are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Republic Plaza Props. P'ship v. Commissioner, 107 T.C. 94, 104 (1996). Deductions are a matter of legislative grace, and a taxpayer likewise bears the burden of proving his or her entitlement to deductions allowed by the Code. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Under section 7491(a), in certain circumstances the burden

[*30] of proof may shift from the taxpayer to the Commissioner. Petitioner has not claimed or shown that it meets the specifications of section 7491(a) to shift the burden of proof to respondent as to any factual issue.

## II.    Section 183

Generally, section 162 allows a taxpayer to deduct ordinary and necessary business expenses incurred in carrying on a trade or business. For an activity to constitute a trade or business under section 162 it must be conducted with continuity and regularity and with the primary purpose of realizing income or profit. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Westbrook v. Commissioner, 68 F.3d 868, 875 (5th Cir. 1995) (holding that a taxpayer must establish that he or she engaged in the activity with the primary purpose and intent of realizing an economic profit independent of tax savings), aff'g T.C. Memo. 1993-634. The test for determining whether a taxpayer conducted an activity for profit is whether the taxpayer entered into, or continued, the activity "with the actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without published opinion, 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation of profit need not be reasonable, but he or she must have a good-faith objective of making a profit. Allen v. Commissioner, 72 T.C. 28, 33 (1979); sec. 1.183-2(a), Income Tax Regs.

[*31] Whether the required profit objective exists is determined on the basis of all the facts and circumstances in each case, independent of the tax consequences. Allen v. Commissioner, 72 T.C. at 34; see also Agro Sci. Co. v. Commissioner, 934 F.2d 573, 576 (5th Cir. 1991), aff'g T.C. Memo. 1989-687. The taxpayer bears the burden of proving the requisite profit intention. Rule 142(a); Boyer v. Commissioner, 69 T.C. 521, 537 (1977). For partnerships, profit objective is determined at the partnership level rather than at the partner level. Tallal v. Commissioner, 778 F.2d 275, 276 (5th Cir. 1985), aff'g T.C. Memo. 1984-486; Brannen v. Commissioner, 78 T.C. 471, 502-505 (1982), aff'd, 722 F.2d 695 (11th Cir. 1984). Because Robertson was the only owner of WP Realty, we need not separately determine the intent at the partnership level.

A taxpayer may not fully deduct expenses of an activity under section 162 if the activity is not engaged in for profit. Sec. 183(a). Pursuant to section 183(a), if an activity is not engaged in for profit, no deduction attributable to that activity is allowed except to the extent provided by section 183(b). Section 183(b) allows deductions that would be allowed without regard to whether the activity was engaged in for profit, but only to the extent that gross income derived from the activity exceeds the deductions allowable without regard to profit.

**[\*32]** Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors to be weighed when considering whether a taxpayer is engaged in an activity for profit.  These factors are:  (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or the taxpayer's advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, that are earned from the activity; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved in the activity.  We give greater weight to these objective factors than to the taxpayer's statement of intent.  Sec. 1.183-2(a) and (b), Income Tax Regs.; see also King v. Commissioner, 116 T.C. 198, 205 (2001).

Evidence from years after the years in issue is relevant to the extent it creates inferences regarding the taxpayer's requisite profit objective in earlier years.  E.g., Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965) ("[T]he goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years."), aff'd, 379 F.2d 252 (2d Cir.

[*33] 1967); Foster v. Commissioner, T.C. Memo 2012-207; Bronson v. Commissioner, T.C. Memo. 2012-17, aff'd, 591 F. App'x 625 (9th Cir. 2015). All facts and circumstances are to be taken into account, and no single factor or mathematical preponderance of factors is determinative. Westbrook v. Commissioner, 68 F.3d at 876.

1.    Manner in Which Activity Is Conducted

Carrying on an activity in a businesslike manner, such as by maintaining complete and accurate books and records, conducting the activity in a manner similar to other activities of the same nature that are profitable, and making changes in operations to adopt new techniques or abandon unprofitable methods, is a factor that may indicate a profit objective. Sec. 1.183-2(b)(1), Income Tax Regs. Businesslike conduct is characterized by a careful and thorough investigation of the profitability of a proposed venture, monitoring a venture's progress, and attention to problems that arise over time. See Ronnen v. Commissioner, 90 T.C. 74, 93 (1988); Taube v. Commissioner, 88 T.C. 464, 481-482 (1987).

Complete and accurate books and records are more than the mere maintenance of lists of and receipts for expenses. Keating v. Commissioner, T.C. Memo. 2007-309, aff'd, 544 F.3d 900 (8th Cir. 2008). Rather, the term

[*34] "businesslike manner" contemplates the use of cost accounting techniques that provide the taxpayer with information to make informed business decisions. Burger v. Commissioner, T.C. Memo. 1985-523, aff'd, 809 F.2d 355 (7th Cir. 1987).

WP Realty's accounting department kept complete and accurate books and records, produced profit and loss statements, and kept track of and billed Robertson for personal expenses incurred on his behalf. McCormick also put together budgets with each department head and submitted those budgets to Robertson for approval. Robertson and McCormick used WP Realty's books and records to make informed decisions about when to implement capital improvements.

Robertson approached the development of Whispering Pines in a manner similar to the development of Davenport Ranch. He avoided debt financing to fund the development of Whispering Pines. Instead, Robertson made significant capital contributions to WP Realty to build the golf course and lay the infrastructure for future development and expansion. He has focused his attention on creating value and building a reputation. Whispering Pines is now a top-rated golf course, both in Texas and nationally. The Spirit Golf Tournament has further helped establish the brand Robertson sought to create.

[*35] Numerous court opinions mention that a businesslike operation would involve a business plan. See, e.g., Wesinger v. Commissioner, T.C. Memo. 1999-372. Conversely, the fact that a taxpayer does not have a written business plan does not negate a profit motive, as a business plan can be evidenced by actions. Welch v. Commissioner, T.C. Memo. 2017-229, at *29; Annuzzi v. Commissioner, T.C. Memo. 2014-233, at *16.

Respondent contends that WP Realty's 2004 and 2007 business plans were deficient because they focused on philanthropy and provided only generalized goals. Respondent's position is that Robertson organized WP Realty to operate Whispering Pines for the charitable benefit of SGA and the Spirit Golf Tournament.

The 2007 business plan outlined capital improvements that would contribute to the growth of Whispering Pines. These improvements would not have been necessary if Whispering Pines was used to meet the needs of only SGA. The capital improvements were designed to attract members to SGA in order to increase the number of rounds of golf played at Whispering Pines. The 2007 business plan addressed a profit motive. It stated that the "strategic plan will solidify the foundation and infrastructure of Whispering Pines Golf Club moving forward on a profitable self-sustaining basis". After McCormick developed the

[*36] 2007 business plan, he and Robertson discussed capital improvements and the timing of when to implement each project. Robertson and McCormick testified at trial that they waited to develop certain projects until demand justified their development. Each project was specifically implemented to increase capacity at and attract more guests to Whispering Pines.

The Needler short course was built to increase the number of rounds per day Whispering Pines could offer. Other improvements were made to ensure that Whispering Pines would be a top-ranked golf course. The clubhouse was expanded to accommodate more guests and allow for more food and beverage sales.

Perhaps the most important indication of whether an activity is being performed in a businesslike manner is whether the taxpayer implements methods for controlling losses, including efforts to reduce expenses and generate income. See Foster v. Commissioner, T.C. Memo. 2012-207; Dodge v. Commissioner, T.C. Memo. 1998-89, aff'd, 188 F.3d 507 (6th Cir. 1999). WP Realty made improvements to reduce expenses and generate income. The 2007 business plan outlined several capital projects. Whispering Pines would not be able to increase its membership substantially until all the improvements were completed.

[*37] All three of the business plans discuss the need to increase membership numbers and the number of rounds of golf played. Specifically, the 2004 business plan identified 80 individual members and 20 corporate members as its target. By 2007 the corporate membership goal was 40. The national membership category was also added. The amount charged for allocated rounds was increased in 2007. The number of golf rounds consistently increased throughout the years in issue. Membership revenue grew from $660,000 in 2000 to $4,122,500 in 2017.

The number of members was sensitive to membership fees. When the individual membership fee was doubled in 2004, total membership dropped from 201 to 113. Again in 2011 membership declined from 196 to 165 when the individual membership fee increased by $2,000. When the national membership fee increased by $4,000 in 2011, national membership declined from 70 in 2010 to 45 in 2011. WP Realty tried to find the right balance for membership fees and the amount allocated for a round of golf. If it charged too much for a round of golf, it would hurt the bottom line. A higher number of golf rounds played increased food and beverage and merchandise revenues.

Throughout the years in issue revenue was raised from green fees, food and beverage sales, golf merchandise, and rental income from the cottages. From 2011 to 2014 the revenue from green fees increased from $849,923 to $1,123,249, the

[*38] revenue from food and beverages increased from $279,067 to $305,440, the revenue from golf merchandise increased from $338,600 to $408,021, and the revenue from the cottages increased from $203,858 to $211,808. At the end of 2014 not all the improvements identified in the 2007 business plan were implemented. For 2015 and 2016 the revenue continued to increase. The income from cottages more than doubled from 2015 to 2016 because of increasing capacity with the addition of two cottages. For 2016 Robertson's capital contribution was significantly lower than it had been in previous years. Robertson testified that SGA membership reached WP Realty's goal of 300 members in 2018.

Petitioner's expert,[5] Stephen Johnston, testified about the economic difficulties that the golf industry faced. During the 1980s and 1990s there was a boom of golf course construction. Between 1986 and 2005 the golf course supply increased by 44%, outpacing growth in golf participation. For 2011-14, the average net profit margin was negative for privately owned golf courses and

---

[5]Pursuant to Fed. R. Evid. 702(a) a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify if his or her "specialized knowledge" will help the trier of fact to understand the evidence or determine a fact in issue. We focus on the degree to which an expert's opinion is supported by the evidence. The reliability and relevancy standards embodied in Fed. R. Evid. 702(a) apply equally to expert testimony that is not "scientific". Kumho Tire Co. v. Carmichael, 526 U.S. 137, 148 (1999).

[*39] country clubs. According to Johnston golf course closures have increased significantly since Whispering Pines opened in 2000. He testified that to build a new golf course capable of achieving the highly marketable top-100 status requires significant long-term planning and strategic thinking.

WP Realty was facing an uphill battle to be profitable. The economic downturn and the financial struggles of the golf course industry made it more difficult. To overcome these obstacles WP Realty came up with a business plan to increase revenues. WP Realty also undertook steps to make Whispering Pines more marketable, which included having the course become a top-ranked course and hosting tournaments not related to the Spirit Golf Tournament.

WP Realty was in a unique situation because of its coexistence with SGA. This coexistence was a result of a compromise with the IRS. Robertson testified that he came up with a "plan B" to create a for-profit business. Robertson sought to strike the right balance between SGA and WP Realty. He wanted to carry out the goals of SGA while building a profitable golf course. We conclude that WP Realty conducted the operation of Whispering Pines in a businesslike manner. This factor strongly favors WP Realty.

**[*40]** 2.     Expertise of the Taxpayer or Her/His Advisers

The taxpayers' expertise, research, and study of an activity, as well as their consultation with experts, may be indicative of a profit motive. See sec. 1.183-2(b)(2), Income Tax Regs. The type and quality of advice that a taxpayer seeks is important to the analysis of the taxpayer's consultation with experts. See Engdahl v. Commissioner, 72 T.C. 659, 668 (1979) (noting that informal and continuous consultations with experts in the field demonstrates an intent to engage in a business for profit).

Robertson not only has prior experience with real estate and golf course development, but he also surrounded himself with experts in golf to create Whispering Pines. He hired Jack Nicklaus Productions, a brand name in the world of golf, to design and build the 18-hole championship course. Williams, the course architect, also designed the Needler and the cart paths along the 18-hole championship course.

WP Realty's employees have extensive experience in the golf industry. Rowe was instrumental in helping Whispering Pines achieve national rankings. McCormick had 10 years of golf course experience before coming to Whispering Pines. Dieckhoff worked at a famous course before he was hired as the course superintendent.

**[*41]** We conclude that WP Reality relied upon experts. Robertson hired and consulted with experts from the start of the construction of Whispering Pines and continues to discuss improvements with experts. We find this factor favors WP Realty.

### 3. Taxpayers' Time and Effort Devoted to the Activity

The taxpayers' devotion of much of their personal time and effort to carrying on an activity may indicate a profit motive, particularly if the activity does not involve substantial personal or recreational aspects. Sec. 1.183-2(b)(3), Income Tax Regs. A profit motive may also be indicated if taxpayers "employ[] competent and qualified persons to carry on such activity." Id. Robertson hired experienced managers to oversee course operations, a renowned golf professional to assist guests, and a top chef to prepare meals.

Whispering Pines had approximately 120 employees on staff. Robertson met weekly with McCormick to keep apprised of the ongoing operations at Whispering Pines and discuss revenues and expenses. The employment of "competent and qualified" people to carry on an activity when the taxpayers' time devoted to the activity is limited can indicate a profit motive. Id.; see also Welch v. Commissioner, at *33; Annuzzi v. Commissioner, at *23. We conclude that this factor favors WP Realty.

**[*42]** 4.     Expectation That the Activity's Assets May Appreciate

An expectation that assets used in the activity will appreciate may indicate a profit motive even if the taxpayer derives no profit from current operations. Sec. 1.183-2(b)(4), Income Tax Regs. "The term 'profit' encompasses appreciation in the value of assets, such as land, used in the activity." Id. A taxpayer's willingness to sustain continued operating losses because of his or her subjective expectation that the assets used in the activity will increase in value is indicative of a profit motive. Engdahl v. Commissioner, 72 T.C. at 669; see also Allen v. Commissioner, 72 T.C. at 36.

Respondent contends that Robertson indicated that Whispering Pines would never become a real estate development. SGA sent a protest letter to the IRS when it was denied charitable status, and this letter indicated that Whispering Pines would not engage in real estate development. The circumstances regarding real estate development changed when the IRS and Robertson reached an agreement about the charitable status of SGA.

Even though Robertson hired Bechtol in 2014 and had an appraisal completed in 2015, no actions were taken to develop residential lots. Both the hiring of Bechtol and the appraisal occurred after respondent began his audit of WP Realty's income tax returns for 2011 and 2012. Robertson referred to

**[*43]** developing residential lots as a future plan. WP Realty produced no evidence that showed anticipated appreciation of Whispering Pines' assets would be sufficient to overcome its losses. We conclude that this factor favors respondent.

5.  Taxpayer's Success in Carrying on Other Similar or Dissimilar Activities

If a taxpayer has previously engaged in similar activities and made them profitable, this success may show that the taxpayer has a profit objective, even though the current activity is presently unprofitable. Sec. 1.183-2(b)(5), Income Tax Regs. A taxpayer's success in other, unrelated activities may also indicate a profit objective. Id.

Robertson succeeded in developing two other projects similar to Whispering Pines. Both Davenport Ranch and Bear Creek included real estate development, but their profitability depended on the success of a golf course. Bear Creek took approximately 10 years to reach profitability. Both Davenport Ranch and Bear Creek differ from Whispering Pines because they included real estate development. However, both projects provided Robertson with the opportunity to gain experience in developing a golf course. In particular, from Davenport Ranch

[*44] he learned how to structure a golf course for real estate development and how the number of members affected the operations of a golf course.

His previous experiences taught him the benefits of not using debt financing. He testified about similar projects' going bankrupt because of their reliance on debt financing. From his experience he also understood the importance of being patient because it may take time before a project is profitable. We conclude this factor favors WP Realty slightly.

6. History of Income or Losses

A history of continued losses with respect to the activity may indicate the lack of a profit motive. See id. subpara. (6). While a series of losses during the startup stage of an activity may not necessarily indicate a lack of profit motive, a record of large losses over many years is persuasive evidence that a taxpayer did not have such a motive. See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd, 647 F.2d 170 (9th Cir. 1981).

WP Realty has sustained losses in each year of its operations. Its Forms 1065 reported an ordinary business loss each year. The losses ranged from $3,137,519 to $4,329,800 during the years in issue. These losses were fairly

[*45] consistent with losses in prior years.  Losses increased in 2015 to $4,883,197. However, for 2016 WP Realty had a net operating profit of $747,146.[6]

Respondent contends that WP Realty did not charge SGA enough rent to break even; from 2004 through 2014 SGA's lease agreements had a stated base lease of zero.  However, SGA paid $500,000 in total base lease payments each year from 2011 to 2014 in addition to the amount paid for rounds its members played.  Respondent contends that if WP Realty had an actual profit motive it would have either negotiated for better lease terms with SGA or found a different lessee for Whispering Pines.

WP Realty contends that the large losses are due in part to the long-term plan to develop Whispering Pines, which is similar to other golf course projects. Robertson testified that it would take time to develop Whispering Pines and that it has taken longer than he expected.  He further testified that Whispering Pines has reached its goal of 300 members and that the "level of revenue to be able to conduct charity and to run the golf course in [sic] a profitable basis".

Another barrier to profitability is that Whispering Pines is at least 90 miles from a significant population center.  Robertson explained at trial that he knew

---

[6]When depreciation is added back to the ordinary loss of $443,452 for 2016, there is a net operating profit.

[*46] Whispering Pines would have to be a destination course. To accommodate overnight guests WP Realty had to invest in the infrastructure to support those guests. Further, attracting the type of guests to Whispering Pines that Robertson was targeting required building an excellent brand and reputation, both of which take time to develop.

WP Realty accomplished these goals by building the Needler, which expanded the number of players it can host during a given day. The teaching facility offers guests the opportunity to get instruction on improving their game. Spirit Hall and the Roost allow WP Realty to increase revenue through increased food and beverage sales. The national course ranking increases Whispering Pines' reputation and prestige, allowing it to retain loyal members. Robertson and McCormick both testified that WP Realty waited until there was enough demand to support building out each of these projects.

During the years in issue WP Realty was in the process of completing projects in its 2007 business plan. The Needler and the Roost were not finished until 2013. Spirit Hall and improvements to the cart paths were not finished until 2015. Robertson explained that it would be difficult to grow membership in SGA and increase the rounds of golf played until the improvements were made.

**[\*47]** Because of the long history of losses this factor weighs in favor of respondent. However, we are not convinced that these losses negate WP Realty's actual and honest intent to profit from the operation of Whispering Pines. WP Realty's recent financial improvements and business plan indicate achieving the goal of making a profit. See Bessenyey v. Commissioner, 45 T.C. at 274.

### 7. Amount of Occasional Profits

A taxpayer's derivation of some profits from an otherwise money-losing venture may support the existence of a profit motive. See sec. 1.183-2(b)(7), Income Tax Regs. The regulation further states: "[A]n opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated." Id. Since WP Realty has neither made a profit nor engaged in a highly speculative venture, this factor favors respondent.

### 8. Taxpayer's Financial Status

Substantial income from sources other than the activity may indicate that the activity is not engaged in for profit. Id. subpara. (8). Robertson had substantial wealth not related to WP Realty. He contributed more than $101 million of his own money for WP Realty's capital. But wealth not associated with the activity in

**[*48]** issue is not a bar to that activity's being engaged in for profit. Welch v. Commissioner, at *41.

The receipt of a tax benefit does not alone establish that the taxpayer lacks a profit objective. See Engdahl v. Commissioner, 72 T.C. at 670. Even though the losses were large, Robertson had substantial income during the years in issue. The tax benefits are not comparatively substantial enough to indicate that WP Realty did not expect to make a profit. Cf. Golanty v. Commissioner, 72 T.C. at 428-430. We conclude this factor is neutral.

9. Elements of Personal Pleasure or Enjoyment

The presence of personal motives in conducting an activity may indicate a lack of profit objective, especially if the activity involves personal or recreational elements. Sec. 1.183-2(b)(9), Income Tax Regs. An activity is not classified as a hobby simply because the taxpayer finds it pleasurable. Jackson v. Commissioner, 59 T.C. 312, 317 (1972). The analysis does not require that the activity be engaged in with the exclusive intent of deriving a profit or even maximizing profits. Sec. 1.183-2(b)(9), Income Tax Regs.

Respondent contends that Robertson enjoyed golf and has unrestricted access to Whispering Pines and its amenities. Robertson golfed at Whispering Pines only three times during the years in issue. Respondent further contends that

**[\*49]** Robertson and his family's exclusive use of the Robertson Area resulted in personal pleasure.

Camp Olympia required Robertson's attention, and he had the Victorian home moved to the Robertson Area more than 20 years before he developed Whispering Pines or incorporated SGA. The new house in the Robertson Area was not completed until after the years in issue.

Respondent argues that Robertson's passion for philanthropy, rather than profit, is the driving force behind developing Whispering Pines and SGA. Originally, Robertson wanted to develop a course and donate it to charity. Once he learned that was not possible if SGA was to become a charitable organization, he took a different approach, which was for Whispering Pines to be a for-profit business. We conclude that this factor is neutral.

III.   Conclusion

After a review of all the facts and circumstances and for the reasons stated above, the Court finds that WP Realty was engaged in a for-profit activity for the years in issue. Even though we agree with respondent that Robertson initially had the goal of creating a charitable organization, we are convinced that WP Realty's predominant, primary, or principal objective was to realize an economic profit

**[*50]** independent of tax savings.  Once WP Realty was created, Robertson had the intent to make a profit.

Because SGA has now reached WP Realty's membership goal of 300 and the major improvements are completed, we expect that WP Realty has turned a corner and will start to make a profit.  However, if losses continue, WP Realty may again find its profit motive before this Court.

The Court has considered all of the arguments made by the parties, and to the extent that they are not addressed herein, they are considered unnecessary, moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for petitioner</u>.