# United States Tax Court

T.C. Memo. 2024-114

DENHAM CAPITAL MANAGEMENT LP, DENHAM CAPITAL
MANAGEMENT GP LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket No. 9973-23.                     Filed December 23, 2024.

———————

*Shannon C. Fiedler*, *Brian C. McManus*, and *Elizabeth A. Kanyer*, for petitioner.

*Julie V. Skeen*, *Emerald G. Smith*, *Alicia H. Eyler*, *Naseem J. Khan*, and *Michael E. Washburn*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, *Chief Judge*: Respondent issued Notices of Final Partnership Administrative Adjustment (FPAA) for tax years 2016 and 2017 (years in issue) to Denham Capital Management GP LLC (petitioner) as tax matters partner for Denham Capital Management, LP (Denham). In the FPAAs respondent increased Denham's net earnings from self-employment (NESE) for 2016 and 2017 by $27,475,186 and $22,919,414, respectively. Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*2] The issues for consideration are whether (1) an adjustment to a partnership's NESE is an adjustment to a partnership item subject to determination at the partnership level and (2) the income attributable to five of Denham's partners is excludable from Denham's NESE under the limited partner exception pursuant to section 1402(a)(13).

## FINDINGS OF FACT

Some of the facts are stipulated and so found. The Stipulations of Facts and the attached Exhibits are incorporated herein by this reference. Denham's principal place of business was Massachusetts when its Petition was timely filed.

Petitioner is the tax matters partner and state law general partner of Denham. Petitioner is a Delaware limited liability company and elected to be treated as a partnership for federal income tax purposes. Denham is organized as a limited partnership under Delaware law and offers investment advisory and management services to affiliated private equity funds that invest in the energy sector, specifically oil and gas, mining, and power. Pursuant to investment advisory agreements between Denham and each fund, Denham was expected to furnish investment advice, negotiate terms of investments, monitor the health of the investments, and complete the day-to-day administrative tasks associated with managing the funds.

*Denham's Partners and the Partnership Agreement*

In addition to petitioner Denham had five limited partners during the years in issue. These individuals were Stuart Porter, Scott Mackin, Carl Tricoli, Riaz Siddiqi, and Jordan Marye (collectively, Partners). The Partners functioned similarly to and were subject to the same general policies and procedures as Denham's employees.

Denham's Fifth Amended and Restated Limited Partnership Agreement (LPA), effective May 1, 2014, governed the obligations and authority of Denham's partners for the years in issue. Under the LPA, petitioner, as general partner of Denham, had "unlimited liability" for Denham's debts. Partners enjoyed limited liability and could be held personally liable for the debts and obligations of Denham only to the extent, if any, of capital contributions they made to Denham.

The LPA vested all management authority exclusively in petitioner. Mr. Porter owned 100% of the equity of petitioner, but all of the Partners were voting members of petitioner throughout the years in

[*3] issue. Denham's limited partners had authority to the extent petitioner delegated authority to them. On November 1, 2013, acting in his authority as managing member of petitioner, Mr. Porter authorized via written resolution Messrs. Tricoli, Mackin, and Siddiqi, along with Denham's chief financial officer, director of tax, general counsel, and associate general counsel, to negotiate and execute any type of agreement or document on petitioner's behalf. The resolution also authorized Kelly Henry, whose role with Denham could not be determined from the record, to execute any federal or state tax return. Denham's LPA also required that each partner, except for Mr. Porter, "devote substantially all of his or her business time and attention to the affairs of [Denham] and its affiliates."

Messrs. Porter, Siddiqi, and Tricoli were Denham's founding partners. On February 15, 2007, Mr. Porter contributed approximately $8 million in exchange for his limited partner interest. Other than Mr. Porter's initial contribution, no other capital contributions were made to Denham by any of the partners. Messrs. Tricoli, Siddiqi, Mackin, and Marye received their limited partner interests in Denham through grants of profits interests at various times ranging from April 2008 to May 2014.

Denham's Partners had the authority to remove partners by consensus. The Partners voted informally to decide whether to expel an underperforming partner. Partner removal occurred according to written agreements whereby the exiting partner disassociated simultaneously from all Denham-related entities. For example, two partners exited Denham in this fashion before the years in issue. Mr. Siddiqi, for reasons other than his performance, began phasing out of Denham by the end of 2017.

The Partners held various roles and responsibilities not explicitly outlined in the LPA. Mr. Porter oversaw Denham's investment strategy from a macroeconomic perspective through managing the risk group, which performed risk analyses of transactions and Denham's portfolios and provided its recommendations to the appropriate investment committee. Denham carried total life insurance coverage on Mr. Porter of $90 million in 2016 and $30 million in 2017. Mr. Porter also spent a considerable amount of his time meeting with lower level Denham employees to discuss career development and their ongoing work.

Messrs. Tricoli, Mackin, and Marye each held the title of managing partner and led deal teams within their respective sectors.

[*4] Messrs. Tricoli and Mackin also held the title of copresident. Mr. Tricoli led oil and gas and mining deal teams. Mr. Mackin joined Denham as a managing director before becoming partner in 2010. During the years in issue Mr. Mackin led deal teams in the power sector. Mr. Marye was promoted to partner in 2014, and he also led oil and gas sector deal teams.

Mr. Siddiqi served as managing partner and led the portfolio services group during the years in issue. The portfolio services group was an internal Denham team which monitored and reported on the status of the investments Denham managed. The group conducted extensive due diligence and intervened where a company a Denham fund had invested in, called a portfolio company, did not meet expectations. Intervention typically involved forming and implementing a business plan, hiring or replacing management, or exiting the investment early. During the years in issue Mr. Siddiqi was personally involved with Denham's rehabilitation of at least two portfolio companies.

The Partners' role with Denham was so fundamental to the firm's operation that investors had the right to withdraw their investments early if one or more of the Partners died, became disabled, or could no longer devote substantially all business time to the funds. Each fund's "key person" provision referred to Mr. Porter, but all five Partners were considered a key person by at least one of the funds active during the years in issue.

In addition to their specific titles and roles, certain responsibilities were handled by all the Partners. First and foremost, each of the Partners served on some or all of Denham's management, valuation, and/or investment committees, which are discussed in further detail below. Excluding Mr. Porter, the Partners frequently served on boards of directors of portfolio companies. A Denham partner or employee was not compensated for serving on a portfolio company's board of directors. The Partners often discussed their decision making in their director roles with other Denham Partners but observed that they owed fiduciary duties to the portfolio companies' other shareholders.

Messrs. Porter, Mackin, and Marye were actively engaged in fostering and attracting investor relationships. They frequently traveled to meet with potential and current investors for fundraising

**[*5]** purposes. When the Partners traveled, travel reimbursements were provided by Denham, not petitioner.

The Partners made most business decisions affecting Denham's internal operation through the management committee. Petitioner established the management committee, which was empowered pursuant to Article III, section 3.02(b) of the LPA. In 2016 and 2017 Messrs. Porter, Tricoli, and Mackin were the sole members of the management committee. The management committee discussed issues such as, but not limited to, budgeting, significant employee hirings or departures, and the expansion of the number of offices.

*Denham's Operation*

Denham managed five active funds in 2016 and seven active funds in 2017, under which it had $7.5 billion and $8.3 billion of assets under management, respectively. Messrs. Porter, Siddiqi, and at least one other of Denham's Partners were directly involved with each fund. Each partner is referenced in every private placement memorandum (PPM), and each investment committee had Mr. Porter, Mr. Siddiqi, and at least one more. Denham had approximately 80 employees during the years in issue. In 2017 Denham's compensation per employee ranged from approximately $61,000 to $1,200,000. Denham was scheduled to pay approximately $21,302,203 in total employee compensation in 2017. With the exception of Mr. Siddiqi, who had begun to phase out, each of the Partners was scheduled to receive a salary of $325,000 and no bonus. Twenty-three of Denham's employees were scheduled to receive total compensation exceeding the Partners' salaries.

Each fund is a separate entity formed as a limited partnership with another limited partnership as its general partner. The partners of the limited partnerships that served as the funds' general partners were generally partners and/or employees of Denham. Each fund's general partner had the authority to make all investment decisions for the respective fund, and its investors, primarily institutional, purchased limited partner interests in the fund entities to make their investments. Fund investors had no decision-making authority as part of their limited partnership stake.

Each fund paid Denham quarterly management fees in exchange for its advisory services. Management fee terms varied by fund but typically ranged between 0.75% and 1.75% of capital committed by investors. Denham generated $69,903,232 and $61,280,194 in total

[*6] revenue for 2016 and 2017, respectively, all of which was derived from fees collected in exchange for its investment management services.

Denham's funds generally followed a specific process in making their investments. At the outset Denham established the fund's legal structure, and the Partners collectively determined the fund's fundraising target, or the "top target capital raise," based on market factors. To aid the Partners in soliciting capital commitments, Denham hired outside counsel to prepare PPMs to inform potential investors of the details of each fund. Denham's general counsel and the Partners reviewed the PPMs before they were circulated to potential investors. The PPMs informed investors about the fund's objectives, its strategies, and the Denham team overseeing the fund, including a professional biography of each Partner and the senior-level employees that supported that respective sector.

According to Denham's recommendations, the funds used the committed capital to acquire equity interests, typically controlling interests, in portfolio companies Denham viewed as being fit for investment, held them for a period, and then "exited" the investments by selling the equity they had acquired and returning capital to investors.

Denham's method of providing advice to the funds involved multiple internal Denham teams, such as each fund's deal team, investment committee, and valuation committee. Deal teams consisted of sector-specific groups of investment professionals under the supervision of a Partner or a managing director. Voting members of the investment committees typically included one or more of Denham's Partners and other senior professionals. In 2016 and 2017 Messrs. Porter, Tricoli, and Siddiqi served on the investment committee for every fund Denham managed. Also during the years in issue, Mr. Mackin served on the committees for the commingled commodity funds and Mr. Marye served on the oil and gas fund's investment committee.[1]

Each fund's deal team was responsible for generating and analyzing investment proposals and presenting them to that fund's investment committee. Investment committees met weekly to consider and vote on potential new investments and significant decisions relating to existing investments. For the committee to adopt an investment

---

[1] Other limited partners whose status as such is not in question for the years in issue also served on various investment committees.

**[*7]** recommendation, the vote needed to be unanimous. As a result, each of the Partners, while having no affirmative authority to do so, could effectively reject an investment proposal unilaterally. The respective fund's deal team executed recommendations approved by the investment committee and monitored portfolio companies.

The investment committees closely scrutinized each recommendation. Deal teams circulated memoranda explaining the details of investment proposals, followed by a presentation of the same to the investment committee. Voting members of the respective investment committee debated the proposal before voting. Partners, even when discussing a proposal before a committee they were not a voting member of, were encouraged to use their specialized knowledge of finance and the commodities industry to provide feedback on the proposal being discussed. The deal teams and investment committees worked closely with other Denham teams such as the risk group and the portfolio services group throughout the process.

Denham's valuation committees reviewed, discussed, and approved recommendations with respect to valuations prepared by the deal teams. Valuation recommendations were made quarterly on a company-by-company basis and were necessary for accurate financial reporting to regulators and fund investors. The valuation committee's role was advisory as it did not have the authority to obligate a fund to accept or reject a valuation.

Most portfolio companies were not traded on public markets, and consequently the valuation process involved benchmarking investments against comparable public market investments or other ventures Denham had engaged in. Denham's accounting team refined the valuations it proposed in response to valuation committee members' critical evaluation and inquiries into the assumptions and methodologies used to reach their conclusion. Once all disagreements were resolved, the valuations were presented for a vote.

In 2016 and 2017 the valuation committees included a broad group of Denham personnel, such as the chief financial officer, the general counsel, and other senior professionals, including all five of the Partners. As with Denham's investment committees, approval of a valuation recommendation required a unanimous vote from the valuation committee, and thus one voting member could effectively reject a recommendation.

**[*8]**  A fund's decision to initiate, alter, or exit an investment was made according to recommendations given to it by Denham.  The recommendations were reviewed, scrutinized, and revised at the direction of the Partners that were voting members of the respective investment committee.  Each fund's general partner had the authority to reject a recommendation that was approved by an investment committee, but that never actually occurred.

Denham's PPMs frequently represented to potential investors that "[t]he overall direction of the firm is guided by its partners." Further, the Partners' experience and expertise was an influential consideration to potential investors.  In contrast to the employees who provided support, Denham's Partners used their experience and expertise to make the strategic decisions related to Denham's provision of investment advisory services in three distinct areas. The Partners (1) managed investor relations and fundraising; (2) made fundamental business decisions by serving as voting members of one or more of Denham's management, valuation, and investment committees, and (3) managed their sector's deal teams, including making personnel decisions.

*Denham's Financial and Tax Reporting*

Chief Financial Officer John Collins led Denham's finance team and handled financial reporting for Denham and its affiliates.  Denham worked in conjunction with PricewaterhouseCoopers, LLP (PwC), to have its financial statements audited and to prepare Denham's Forms 1065, U.S. Return of Partnership Income.  PwC's audit report described the Partners as "active limited partners," a term provided by Denham.

Petitioner made no guaranteed payments or distributions to the Partners in 2016 or 2017.  In each of those years Denham made guaranteed payments and capital distributions to the Partners and petitioner.  The guaranteed payments were intended to represent the Partners' salaries and included the value of a package of typical employment benefits.  The distributions to the Partners were tied to their distributive shares of Denham's income and calculated on the basis of their profits interests.  There was no guaranteed minimum for the Partners' distributive shares for the year, and they varied from year to year as they were tied to the profits of the firm.

When computing the Partners' NESE for the years in issue, Denham included their guaranteed payments but excluded their

**[\*9]** distributive shares of Denham's ordinary business income. The following tables show the amounts of guaranteed payments, NESE, and distributions Denham reported on its returns for 2016 and 2017:

| *2016* | | | | |
|---|---|---|---|---|
| | *Ordinary Income* | *Guaranteed Payments* | *NESE* | *Distributions* |
| Petitioner | $33,813 | — | $33,633 | $39,574 |
| Stuart Porter | 10,027,043 | $427,178 | 427,178 | 8,723,326 |
| Scott Mackin | 3,990,985 | 241,565 | 241,565 | 3,030,423 |
| Carl Tricoli | 6,931,842 | 350,820 | 350,820 | 5,656,821 |
| Riaz Siddiqi | 2,456,321 | 382,820 | 382,820 | 2,083,944 |
| Jordan Marye | 4,068,995 | 342,516 | 342,516 | 2,424,961 |

| *2017* | | | | |
|---|---|---|---|---|
| | *Ordinary Income* | *Guaranteed Payments* | *NESE* | *Distributions* |
| Petitioner | $28,088 | — | $28,268 | $24,705 |
| Stuart Porter | 6,554,420 | $382,959 | 382,959 | 7,091,483 |
| Scott Mackin | 2,662,994 | 179,704 | 179,704 | 2,919,166 |
| Carl Tricoli | 6,890,616 | 389,633 | 389,633 | 7,316,065 |
| Riaz Siddiqi | 1,412,031 | 47,175 | 47,175 | 1,434,193 |
| Jordan Marye | 5,398,806 | 367,809 | 367,809 | 5,331,920 |

Denham reported total NESE of $1,778,532 and $1,395,001 for 2016 and 2017, respectively.[2] On March 27, 2023, respondent issued the FPAAs for the years in issue, increasing Denham's NESE to $29,253,718 and $24,314,415 for 2016 and 2017, respectively.

## OPINION

The Commissioner's determinations in an FPAA are generally presumed correct, though the taxpayer can rebut this presumption. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Republic*

---

[2] For 2017 Denham reported $547 less of total NESE than the sum of the NESE it reported on the Partners' Schedules K–1, Partner's Share of Income, Deductions, Credits, etc. We see no reason for this difference other than computational error. We need not decide the effect of this error as it does not affect our resolution of this case.

[*10] *Plaza Props. P'ship v. Commissioner*, 107 T.C. 94, 104 (1996). Section 7491 provides that the burden of proof on a factual issue may shift to the Commissioner if the taxpayer satisfies specified conditions. Among these conditions are that the taxpayer must have "introduce[d] credible evidence with respect to [that] factual issue." § 7491(a)(1).

When each party has satisfied its burden of production, then the party supported by the weight of the evidence will prevail, and thus a shift in the burden of proof has real significance only in the event of an evidentiary tie. *See Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340. We have discerned no evidentiary tie on any relevant factual question and are able to decide the issues on the preponderance of the evidence. *See, e.g.*, *Bordelon v. Commissioner*, T.C. Memo. 2020-26, at *11.

Generally, NESE includes

the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by [subtitle A] which are attributable to such trade or business, plus his distributive share (whether or not distributed) of income or loss described in section 702(a)(8) from any trade or business carried on by a partnership of which he is a member . . . .

§ 1402(a).

Section 1402(a) also provides a list of exclusions from NESE. Relevantly, section 1402(a)(13) excludes from NESE an individual's

distributive share of any item of income or loss of a limited partner, as such, other than guaranteed payments described in section 707(c) to that partner for services actually rendered to or on behalf of the partnership to the extent that those payments are established to be in the nature of remuneration of those services . . . .

Section 1402(a)(13) is commonly referred to as the limited partner exception. Resolution of this case depends on our classification of Denham's partners under section 1402(a)(13).

Recently, the Court held in *Soroban Capital Partners LP v. Commissioner*, 161 T.C. 310 (2023), that the Court has jurisdiction to determine a state law limited partner's status for the purpose of

**[*11]** determining applicability of the limited partner exception in partnership level proceedings pursuant to the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324, *Soroban*, 161 T.C. at 325, and that such determinations require a functional analysis inquiry to ascertain the roles and responsibilities of partners to determine their status for tax purposes, *Soroban*, 161 T.C. at 319. Petitioner challenges both of *Soroban*'s holdings.

Petitioner contends that *Soroban* missed the mark because therein the Court did not consider a third element of the definition of partnership items—that the item must affect the entire partnership, not just the partners individually. The Court adheres to the doctrine of stare decisis and thus affords precedential weight to its prior reviewed and division opinions. *E.g.*, *Analog Devices, Inc. & Subs. v. Commissioner*, 147 T.C. 429, 443 (2016). We revisit our prior decisions only when presented with a special justification to do so. *Sec. State Bank v. Commissioner*, 111 T.C. 210, 213 (1998), *aff'd*, 214 F.3d 1254 (10th Cir. 2000). We see no special justification to revisit *Soroban*'s reasoning. Therefore, determination of the applicability of the limited partner exception is a partnership item over which the Court has jurisdiction. Also, determinations under section 1402(a)(13) require a functional analysis inquiry to ascertain the Partners' roles and responsibilities for tax purposes.

*Functional Analysis Test*

Section 1401 imposes a tax on every individual's self-employment income for a taxable year. § 1401(a) and (b). With minor exceptions not relevant here, self-employment income is equivalent to the NESE derived by an individual during the taxable year. § 1402(b). Section 1402(a)(13) excludes from NESE an individual's distributive share of any item of income or loss of a "limited partner, as such," other than guaranteed payments described in section 707(c) to the extent the payments are in the nature of remuneration of services actually rendered to or on behalf of the partnership. We construe exceptions to NESE narrowly to achieve the congressional policy that the optimum number of potentially eligible persons will be provided for under the Social Security framework. *Stevenson v. Commissioner*, T.C. Memo. 1989-357, 57 T.C.M. (CCH) 1032, 1034 (citing *Johnson v. Commissioner*, 60 T.C. 829, 833 (1973)).

In *Soroban*, 161 T.C. at 320−31, the Court held "that the limited partner exception does not apply to a partner who is limited in name

**[\*12]** only" and that "Congress intended section 1402(a)(13) to apply to partners that are passive investors." Before *Soroban*, in *Renkemeyer, Campbell & Weaver, LLP v. Commissioner*, 136 T.C. 137 (2011), the Court applied a functional analysis test to determine whether the lawyer-partners of a Kansas limited liability partnership were limited partners under section 1402(a)(13).

The Court in *Renkemeyer* looked to the legislative history to provide insight with respect to Congress's intent. *Renkemeyer*, 136 T.C. at 150. We held that "the intent of section 1402(a)(13) was to ensure that individuals who merely invested in a partnership and who were not actively participating in the partnership's business operations (which was the archetype of limited partners at the time) would not receive credits toward Social Security coverage." *Id.* Furthermore, the legislative history does not support the conclusion that Congress intended to exclude partners who performed services for a partnership in their capacity as partners (i.e., acting in the manner of self-employed persons) from liability for self-employment taxes. *Id.*

The parties disagree on whether the Partners are limited partners for purposes of section 1402(a)(13). Petitioner contends that a functional analysis test in the context of a limited partnership should inquire whether the partners have maintained their limited liability status under state law or the Revised Uniform Limited Partnership Act. As part of its analysis in *Renkemeyer*, the Court held that a partner's having limited liability was not enough for the partner to qualify as a limited partner for purposes of section 1402(a)(13). *Renkemeyer*, 136 T.C. at 147. The Court concluded that the interest of a limited partner in a limited partnership is similar to the interest of a passive investor. *Id.* at 147–48.

In *Renkemeyer* the Court focused on how partnership income was derived and found that it was received in exchange for legal services performed by the partners. *Id.* at 150. Each of those partners participated in management of the firm and contributed only a nominal amount of capital for his respective partnership units. *Id.* at 141. Those facts led the Court to conclude that the partners' distributive shares of income were not a return on the partners' investments, but rather earned from the provision of legal services performed by the partners on behalf of the law firm. *Id.* at 150. *Renkemeyer*'s conclusion was not affected by the fact that the partners failed to comply with formalities prescribed by state partnership law. *Id.*

**[\*13]** Since *Renkemeyer*, the Court has continued to use a functional analysis to determine whether state-law partners of passthrough entities are limited partners for the purpose of section 1402(a)(13). In *Castigliola v. Commissioner*, T.C. Memo. 2017-62, at \*12, the Court used the *Renkemeyer* analysis to conclude that the members of a professional limited liability company were not limited partners because they were involved in the management of the business.

The Court has also applied the *Renkemeyer* functional analysis test to determine whether a partner is a "limited partner, as such" under section 1402(a)(13). In *Hardy v. Commissioner*, T.C. Memo. 2017-16, the Court concluded that a surgeon who held a minority interest in a partnership that operated a surgery center was a limited partner for purposes of section 1402(a)(13). The surgeon performed some of his surgeries at the center, but he had no day-to-day or management responsibilities with respect to the partnership; and patients paid separate fees to the partnership for the use of the surgery centers. *Hardy*, T.C. Memo. 2017-16, at \*7. The number of surgeries that the surgeon performed at the center did not affect his distributive share. *Id.* The Court concluded that the surgeon received a distribution based on the fees that patients paid to use the surgery centers, and therefore his distributive share was not subject to the self-employment tax because he received it in his capacity as an investor. *Id.* at \*32. In *Hardy*, as in *Renkemeyer* and *Castigliola*, the functional inquiry was not focused on state law, but rather on the efforts and responsibilities borne by the partner and whether his business arrangement with the partnership in question was more akin to one of employment or one of a passive investment.

Petitioner argues that the pre-*Soroban* cases are inapplicable here because they concerned taxpayers who owned interests in entities other than a state law limited partnership. This argument fails because it ignores that *Soroban* expressly condoned the Commissioner's position therein that "the Court must apply a functional analysis test, *similar to the test outlined in Renkemeyer and subsequent cases.*" *Soroban*, 161 T.C. at 319 (emphasis added). While petitioner is correct that those cases involved entities other than limited partnerships, the Court's opinion in *Soroban* adequately considered and resolved the question that petitioner's argument attempts to answer. Again, without a special justification to reconsider *Soroban*'s holding in this respect, *see Sec. State Bank*, 111 T.C. at 213, we find *Renkemeyer* and the subsequent cases instructive in applying a functional analysis test applicable to state law limited partnerships.

**[\*14]** In addition to disregarding our settled precedent, petitioner's position violates the maxim that federal law, not state law, prescribes classification of individuals and organizations for federal tax purposes. *See, e.g.*, Treas. Reg. § 301.7701-1(a); *see also Kraatz & Craig Surveying Inc. v. Commissioner*, 134 T.C. 167, 180 (2010) ("The meaning of the words or the legal status of circumstances for federal tax purposes need not be identical to their meaning or their legal effect under state law." (quoting *Estate of Steffke v. Commissioner*, 538 F.2d 730, 732 (7th Cir. 1976), *aff'g* 64 T.C. 530 (1975))).

Our caselaw has continuously reinforced our position that determinations under section 1402(a)(13) require a factual inquiry into how the partnership generated the income in question and the partners' roles and responsibilities in doing so. Petitioner's position that the Partners are eligible for the limited partnership exception merely because the Partners complied with formalities prescribed by state partnership law does not comport with our caselaw. *See Renkemeyer*, 136 T.C. at 150; *Castigliola*, T.C. Memo. 2017-62, at \*7–14; *Hardy*, T.C. Memo. 2017-16, at \*29–32.

Petitioner alternatively contends that a passive investor standard violates the canon against surplusage because it renders meaningless the final clause of section 1402(a)(13), also known as the guaranteed payment carveout. *See Growmark, Inc. & Subs. v. Commissioner*, 160 T.C. 475, 486 (2023) ("When construing a statute, the Court must interpret it 'so as to avoid rendering any part of the statute meaningless surplusage.'" (quoting *15 W. 17th St. LLC v. Commissioner*, 147 T.C. 557, 586 (2016))). Specifically, petitioner suggests that because passive investors never receive guaranteed payments, the clause will never be invoked under a passive investor standard. We disagree.

We need to perform a comprehensive inquiry that seeks to determine, on account of the pertinent facts and circumstances, whether the Partners were "*generally* akin" to passive investors. *See Renkemeyer*, 136 T.C. at 147–48 (emphasis added). This standard does not preclude a partner from qualifying for the limited partner exception with respect to his distributive share of partnership income despite receiving a guaranteed payment for services actually rendered, as long as other circumstances of the partner's economic relationship with the partnership sufficiently indicate it is generally one of passive investment. Accordingly, we apply the passive investor standard to the facts of this case.

**[\*15]** To determine Denham's NESE, we must analyze the Partners' roles and responsibilities to ascertain whether their relationships with Denham were more akin to those of passive investors or employees. Petitioner bears the burden of establishing that the Partners' distributive shares represented income of an investment nature. *See* Rule 142(a). To follow the Court's reasoning in *Renkemeyer*, we review the sources of Denham's income for the years in issue, the Partners' role in generating it, and the relationship between the Partners' distributive shares and any capital contributions they made to the partnership. *See Renkemeyer*, 136 T.C. at 150.

Denham's income for 2016 and 2017 consisted solely of fees it received in exchange for services provided to investors such as advising and operating the private investment funds. The Partners' time, skills, and judgment were essential to the provision of these services. The fees were substantial, generating approximately $130 million in revenue for Denham across the two years in issue. Denham claims that these amounts, which were largely distributed to the Partners as profits, were returns on their investments despite only one of the Partners' having made a capital contribution to acquire his interest. We disagree.

Except for Mr. Porter, none of the Partners made capital contributions to Denham to acquire their interests. Messrs. Porter and Siddiqi testified that the Partners paid Mr. Porter directly for their interests pursuant to written agreements. No such written agreements have been offered as evidence, and the record discloses no other instance of capital contributions to Denham except Mr. Porter's initial investment.

In 2016 and 2017 Denham made guaranteed payments and capital distributions to each of the Partners. The distributions were multiple times larger than the guaranteed payments in both years. The following table illustrates the absence of capital contributions made by the Partners to Denham and the amounts received in the years in issue they claim are returns on investment:

| [*16] Partner | Capital Contributions Since Inception | 2016 and 2017 Distributive Share | 2016 and 2017 Guaranteed Payments | 2016 and 2017 Distributions |
|---|---|---|---|---|
| Stuart Porter | $8,000,000 | $16,581,463 | $810,137 | $15,814,809 |
| Carl Tricoli | — | 13,822,459 | 740,453 | 12,972,886 |
| Scott Mackin | — | 6,653,979 | 421,269 | 5,949,589 |
| Riaz Siddiqi | — | 3,870,352 | 429,995 | 3,518,137 |
| Jordan Marye | — | 9,467,801 | 710,325 | 7,756,881 |

When the size of a partner's investment is relatively small in comparison to the income the partnership earned for the services the partners provided, the small investment is not sufficient to classify the partner's distributive share as a return on investment. *See Renkemeyer*, 136 T.C. at 150. Considering that the Partners, except Mr. Porter, paid nothing for their partnership interests, it cannot be said that such large portions of the Partners' distributive shares in 2016 and 2017 were returns on investments. Even though Mr. Porter made a capital contribution, he cannot be considered a passive investor in view of the relative size of his investment compared to the substantial fees received by Denham, the central role that he played in generating them, and the fact that Denham carried a "key person" life insurance policy on him during the years in issue.

In addition, all of Denham's Partners, except for Mr. Porter, were required to "devote substantially all of [their] business time and attention to the affairs of the [p]artnership and its affiliates." The Partners, in fact, did each devote substantially all of their time to Denham. The Partners treated their work for Denham as their full-time employment. Each of the Partners participated in the management of Denham in some way. Messrs. Porter, Tricoli, and Siddiqi made up Denham's management committee. All five served on the firm's investment and valuation committees. When not acting by committee the Partners exercised authority delegated to them by petitioner to negotiate and execute any agreement or document to conduct Denham's business. These facts further support that the Partners were crucial and active parts of Denham's business.

[*17] The Partners' expertise and judgment were a significant draw for fund investors, who bargained for the Partners' oversight and could withdraw their investments if certain partners could no longer participate. Fund marketing materials made clear that the Partners had a significant role in Denham's operation, and it was the Partners who solicited capital commitments. Fund PPMs explained that investment decisions for the funds would be made by that fund's investment committee, which included the Partners.

The Partners each exercised significant control over personnel decisions. Through the management committee, and occasionally unilateral action, the Partners decided who to invite to be a new partner and who to hire and fire as employees, and they determined compensation packages. Criteria for hiring and promotion at Denham included strong financial analysis skills and a solid track record in investing. The Partners' control over Denham's personnel decisions is further evidence that the Partners were active and fundamental contributors to Denham's operation.

Denham planned to spend over $23 million in employee compensation for 2017. Such a large payroll indicates a substantial and active business operation, which included the Partners. Further, that a sizable number of Denham employees were scheduled to receive total compensation exceeding the Partners' guaranteed payments that petitioner alleges represented their market-level salary indicates that the guaranteed payments were not designed to adequately compensate the Partners for the value of their services. Petitioner provided no evidence tending to show how the guaranteed payments were calculated.

Denham does not exist without the Partners. Their directional and strategic guidance is what drew investors to Denham in the first place and is the reason Denham has maintained its success. Petitioner contends that the funds were independent and could refuse the recommendations of the Partners, but there is no evidence to support this claim. None of the Partners' investment recommendations were refused in practice. Denham's employees filled the ranks and provided support to effect the Partners' guidance. Employees made up the deal teams that analyzed and executed transactions and completed the day-to-day tasks of monitoring the funds. No employee of Denham had authority to make investment decisions for the funds. Individuals that serve roles as integral to their partnerships as those the Partners served for Denham cannot be said to be merely passive investors.

**[*18]** Petitioner's position in this case is unpersuasive for three reasons. First, petitioner's reliance on the prior cases of *Joseph v. Commissioner*, T.C. Memo. 2020-65, and *Duffy v. Commissioner*, T.C. Memo. 2020-108, is misplaced. In neither case did the Court address the issue of the applicability of the *Renkemeyer* functional analysis test to a state law limited partner. In other words, the facts and issues of both cases were sufficiently distinct from the record before us now that we do not consider dicta therein to be persuasive here. In any event, they support our conclusion that state partnership law is not determinative. *See Duffy*, T.C. Memo. 2020-108, at *50 n.16 ("In [*Renkemeyer*], 136 T.C. at 147, however, we concluded that an owner's protection from claims against an entity is not enough to qualify the owner as a limited partner for purposes of [section] 1402(a)(13)."); *Joseph*, T.C. Memo. 2020-65, at *59 (acknowledging that the evolution of state law limited liability entities forced the Court in *Renkemeyer* to adopt a functional analysis inquiry seeking to determine whether interest-holders are passive investors).

Second, the record supports the conclusion that the Partners were operating Denham's business as self-employed persons, rather than acting as limited partners as that term would have been understood when Congress enacted section 1402(a)(13). Denham's chief operation was providing investment management services to the funds, and the Partners controlled nearly every aspect of the provision of such services. Petitioner's contentions rest upon changes made to state law after the enactment of section 1402(a)(13), and thus cannot be considered to affect the statute's interpretation.

Third, petitioner's attempt to characterize the Partners' involvement in Denham's operation as carrying out their roles as members of petitioner does not comport with the fact that the Partners were focused on deriving financial benefit to and were compensated by Denham, not petitioner. Mr. Porter's testimony that his roles as a member of petitioner and an adviser to the funds were entirely different confirms that the Partners were providing services to the funds in their capacity as partners of Denham.

Accordingly, we find that the Partners were not "limited partners, as such" under section 1402(a)(13) and that Denham may not exclude the Partners' distributive shares from its NESE by way of the limited partner exception.

**[\*19]** *Conclusion*

We have considered all of the parties' arguments and, to the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

*Decision will be entered for respondent.*